[No. 5122.]
[No. 2708 C. A.]

THE TOWN OF MANITOU ET AL. v. THE FIRST NATIONAL BANK OF COLORADO SPRINGS.

1.  **Cities and Towns—Statutory Construction—Bonds—Commission to Broker.**

    Although 3 Mills' (Rev.) Stats., § 4548b, provides that refunding bonds issued by a city or town shall not be sold at less than their face value, the board of trustees of a town have authority to pay the broker a commission for his services in selling the bonds at their face value.—P. 350.

2.  **Cities and Towns—Duty of Treasurer—Payment of Warrants —Presumptions.**

    In the absence of a showing to the contrary, it will not be presumed that the treasurer of a town failed to comply with the provisions of §§ 4460-4464 of Mills' Ann. Stats., in regard to the order of paying town warrants, thereby making himself liable to the penalty imposed for violation thereof.—P. 352.

3.  **Cities and Towns—Banks and Banking—Contract with Bank to Pay Warrants.**

    A town and a bank arranged that the former should keep its account with the latter and do all its business there, and that town warrants to a certain amount properly indorsed, stamped and deposited by the treasurer, should be received and carried as cash. Thereafter the holder of certain warrants presented them to the treasurer, who stamped them: "Presented Oct. 20, 1897. No Funds" The holder then indorsed and returned them to the treasurer, receiving therefor a check on said bank, which was duly paid by the latter. The treasurer later deposited such warrants uncanceled in the bank, and the account of the town was credited with their face value. Held, that such transaction was not a cancellation and reissue of such warrants.—P. 356.

4. **Banks and Banking—Application of Deposits to Debt Due Bank.**

Where it was arranged between a town and a bank that the former should keep its account with the latter, and that warrants of the town should be carried as cash, a warrant held by the bank becoming payable and the town refusing payment, the bank has a right to apply the town's cash deposits to such payment. —*P. 356.

*Appeal from the District Court of El Paso County.*

*Hon. Morton L. Bailey, Judge.*

Action by The First National Bank of Colorado Springs against the town of Manitou and A. N. Frownie, its treasurer. From a judgment for plaintiff, defendants appeal.        *Affirmed.*

Mr. Ira Harris and Mr. C. J. Perkins, for appellants.

Messrs. Hall, Babbit & Thayer, and Mr. Frederic L. Sherwin, for appellee.

Mr. Justice Maxwell delivered the opinion of the court:

There are no controverted facts in this case which have any bearing upon the questions to be decided.

August 4, 1897, the town of Manitou, through its board of trustees, agreed in writing to pay M. A. Leddy $1,200 for his services in placing or selling at par an issue of its water works refunding bonds amounting to $40,000. An unsuccessful attempt to dispose of the bonds had been previously made.

October 19, 1897, the board of trustees of the town allowed the bills of Mr. Leddy, and ordered warrants drawn in his favor for $800.00, $91.90 and $400.00. The $800.00 and $400.00 warrants were in payment of his services in placing the bonds. The value of the services performed by Mr. Leddy is ad-

mitted. The $91.90 warrant was for expenses incurred by him in engraving and lithographing the bonds, and is not involved in this controversy.

October 20, 1897, warrants of the town were drawn for the above amounts by the proper officers and issued to Mr. Leddy, who, on the same date, presented them to the treasurer of the town, who stamped them: "Presented October 20, 1897. No funds," and signed his name thereto. At the same time Mr. Leddy indorsed the warrants, delivered them to the town treasurer, receiving therefor a check of the town of Manitou, signed by its treasurer, drawn on The First National Bank of Colorado Springs for the sum of $1,291.90, which check was paid by the bank October 21, 1897. Shortly thereafter the warrants were deposited in the First National Bank by the treasurer of the town, the account of the town being credited with the face value of the warrants.

This method of transacting the business of the town was pursuant to an arrangement made between the treasurer of the town and the bank.

It appears that the credit of the town had been below par, there being no market for its warrants, which fact resulted in a loss to the town by reason of the warrants being sold at a discount; the treasurer of the town and other citizens presented the condition of affairs to the bank, asked its assistance, represented that its warrants would be redeemed within eighteen months, and that the outstanding warrants would not exceed $10,000.

It was arranged that the town should transfer its account to the bank, and do all its business there, and that, when the treasurer of the town brought his deposits to the bank, the warrants of the town, properly indorsed, stamped and deposited by him, should be received and carried as cash, or credited

to the treasurer's account as cash, to an amount not exceeding $10,000.

This arrangement was made in May, 1897, and continued in force until March, 1899.

The town, through its treasurer, advertised a call of its warrants, to be paid March 20, 1899, and on March 17, 1899, notified the bank that the warrants held by it, amounting to $1,200, involved herein, would not be paid.

On that day the bank charged the account of the town with $1,436.89, the amount of the two warrants involved herein, and the undisputed $91.90 warrant, with interest thereon to date, and, on the same date, transmitted the warrants by express to the treasurer of the town.

This action was to recover from the bank $1,335.78, the amount of the $800.00 and $400.00 warrants, and interest.

Trial to the court resulted in a judgment in favor of the bank, to reverse which this appeal is prosecuted.

The appellant town relies upon three propositions for a reversal of the judgment.

1.   The contract under which the warrants were issued was *ultra vires* and illegal, and, therefore, the warrants were void.

2.   When the warrants came into the possession of the bank, they had been cancelled, their delivery to the bank was a reissue which, being prohibited by law, rendered the warrants void, although they might have been valid in their inception.

3.   The bank occupied the position of a purchaser, with notice of void warrants.

In support of the first proposition, § 4548b, 3 Mills' (Rev.) Stats., is relied upon. It is as follows:

"All such refunding bonds may be exchanged, dollar for dollar, for the bonds to be refunded, or

they may be sold as directed by the city council or board of trustees of such city or town, and the proceeds thereof shall be applied only to the purpose for which the bonds were issued, and the same shall not be *sold at less than their face value,* nor shall they be issued until the outstanding bonds to be refunded have been called in and cancelled in an amount equal to or in excess of the bonds so issued; *Provided, however,* that all accrued interest on any such bonds to be refunded shall be paid before such refunding bonds are issued.''

The following extract from the minutes of a meeting of the board of trustees of the town, held October 19, 1897, appears in the record.

''Trustee Creighton reported M. A. Leddy had sold the $40,000 refunding water bonds to N. W. Harris & Co., Chicago and New York, at par.

''M. A. Leddy stated he had talked with Mr. Sutton, the cashier of The First National Bank, Colorado Springs. The bank would receive the bonds and transfer them to N. W. Harris & Co., N. Y., for the old bonds at exact cost of transfer.

''Moved by Trustee Creighton, seconded by Trustee French, the report be accepted, the bonds to be turned over to F. D. Fox, the town treasurer, he to deliver the bonds to The First National Bank of Colorado Springs. The bank to deliver the new bonds for the old bonds, bonds for bonds, to The Chemical National Bank of New York for N. W. Harris & Co. at exact cost of transfer. Carried.''

The foregoing shows that the bonds were exchanged for old bonds, pursuant to the terms of the statute above quoted.

In passing, it may be well to note that the treasurer of the town kept one account only in the bank, to which account the warrants were charged by the bank.

The complaint alleged that the $400.00 warrant was drawn on the warrant fund, the $800.00 warrant on the contingent fund. The warrants introduced in evidence show that the $800.00 warrant was drawn as alleged, and the $400.00 warrant "on money in the treasury not otherwise appropriated."

We are in entire accord with counsel in so far as their statement of the law governing municipal corporations and their officers is concerned, and will, therefore, pass that portion of their argument.

In support of the proposition that the contract pursuant to which the warrants were issued was *ultra vires* and illegal, it is contended that the bonds were sold for less than "par *net* to the town," counsel, in their brief, have misquoted the statute under which the bonds were issued. The quotation in the brief is:

. "All such bonds shall be sold as directed by the city council or board of trustees of such city or town, and the proceeds thereof shall be applied only to the purpose for which the bonds were issued; but the same shall not be sold for less than *par net to the town or city issuing them.*"

The statute is as quoted *supra.*

With this statement, we dismiss the argument of counsel based on the force and effect of the words, *"par net to the town or city issuing them,"* which are not found in the statute under consideration, but are found in the quotation (?) of counsel.

Our attention is called to the following authorities: *Whelen's Appeal,* 108 Pa. St. 162; Dillon on Municipal Corporations, § 89; *Lawrence County App.,* 67 Pa. St. 87; *County of Lawrence v. N. W. R. Co.,* 32 Pa. St. 144; *State of Ill. v. Delafield,* 8 Paige 526; *Village of Ft. Edward v. Fish,* 156 N. Y. 363— all of which have been carefully examined, and it is found that they all involve cases in which a commis-

sion or other consideration was allowed the *purchaser* of the bonds, against express provisions of statutes similar to the one under consideration here, and, for this reason, the above authorities are inapplicable, as it is not contended that Mr. Leddy was the *purchaser* of the bonds.

In *Village of Ft. Edward v. Fish, supra,* it is said, at page 372:

"Implied power can be inferred only from the general scope of the actual power, and the necessity of doing something essential to the efficient exercise thereof. The actual power was to borrow money by issuing and selling bonds at not less than par, the express power to issue bonds involved the implied power to pay for engraving, printing and the like. The express power to sell bonds doubtless carried with it the implied power to pay counsel for an opinion as to the validity of the bonds, as was done in this case, and possibly to pay a commission to brokers for selling the bonds. These expenses were incidental to the duty imposed, and fairly came within the scope of the main power."

We believe that the above states the law to be applied to this case, and that, under the facts disclosed by this record, the contract made by the board of trustees with Mr. Leddy to pay him a commission for his services was within the implied powers of the municipal corporation; that the same was not *ultra vires* or illegal, and that the warrants issued in payment of the services rendered under the contract were valid and binding obligations of the municipality.

We are not without support in this conclusion.

The supreme court of Minnesota, discussing the provisions of a statute of that state similar to the provisions of our statute, § 4548b, *supra,* in *State v.*

*West Duluth Land Co.,* 75 Minn. 456, at page 467, said:

"Under the provisions of section 4, chapter 289, *supra,* a sale of the bonds issued thereunder at less than par value was forbidden. The bonds now under consideration, $140,000 in amount, were turned over to a broker for sale under a written contract with the board of county commissioners. In this contract, it was stipulated that the broker should pay for lithographing and printing the blank bonds, for legal advice and services, and all other expenses incident to a sale, for which, and as compensation in full, he was to receive the sum of $14,000—10 per cent. of the face value of the bonds sold. On these facts, we are asked to hold that there was a plain violation of section 4, and that the bonds are void. There might be cases where the facts would very conclusively show that an agreed compensation of 10 per cent. for the sale of the bonds was a palpable evasion of such a section, but we have no such case before us. We cannot say, as a matter of law, that, under the conditions of this contract, there was a violation of section 4, which forbids a sale of the bonds at less than par."

2. At the time the warrants came into possession of the bank, had they been cancelled and reissued?

Section 4454, Mills' Ann. Stats., is relied upon by appellants in support of this position. A portion of such section is quoted in appellant's brief as follows:

"He (treasurer) shall also accompany such accounts with a statement of all moneys received into the treasury, and on what account, during the preceding month, together with all warrants redeemed by him; which warrants, with any and all vouchers held by him, shall be delivered to the clerk and filed

with his account in the clerk's office upon every day of such statement.''

Following that portion of § 4454 above quoted, the statute proceeds:

''He shall return all warrants paid to him marked or stamped 'paid'.''

This was not done in this case, which clearly indicates that the treasurer did not believe that the transaction between himself and Mr. Leddy was a payment or cancellation of the warrants.

It is insisted, however, by appellants, that the transaction was a payment of the warrants, and that the deposit of them with the bank was a reissue.

Sections 4460 to 4464, Mills' Ann. Stats., provide for the registration, order of payment and redemption of city and town warrants, and imposes a penalty by fine upon the treasurer for a failure to comply therewith.

In view of the fact that the arrangement hereinbefore recited between the treasurer and the bank was made in May preceding the issuance of these warrants, it is fair to presume that there were outstanding, registered, unpaid warrants for the town in October, and it will not be presumed that the treasurer violated his duty under the statute last above quoted by paying these warrants out of their regular order, thereby making himself liable to the penalty imposed for violation thereof.

Payment in its broadest signification is a satisfaction of an obligation. There must be an intent upon the part of the obligor or debtor to discharge the obligation or extinguish the debt.

There is nothing in this record to show that there was any such intention upon the part of the treasurer. On the contrary, the evidence abundantly sustains the conclusion that the transaction between the treasurer and Mr. Leddy was not intended as a

payment of the warrants, but was had pursuant to the arrangement made by the treasurer with the bank, was a payment of the bank's money to the warrant holder, and not a payment of the money of the town in discharge or extinguishment of the debt represented by the warrants.

*Beardsley v. Sternberg,* 18 Wash. 612, is a case involving practically the same question here under consideration. It was the custom of the treasurer of the city of Tacoma, when warrants on the town fund were presented to him, to require the payees to indorse them, to give the payees the amount called for by the warrants from the cash box, and place the warrants in the cash box of his safe, where they were kept and treated as money. When several such warrants had accumulated, they were listed, indorsed: "Not paid for want of funds," and delivered to third persons, who paid for them at par, which payments were placed in the box from which the warrants were taken. Sometimes the warrants, after being received from the payees, were deposited and received in a bank as cash, the bank afterwards disposing of them to its customers. In the course of the opinion, the court said:

"That all of the warrants in suit    *    *    * passed through the hands of the city treasurer in the manner above indicated, is not disputed. And whether or not the evidence proves an absolute payment of the warrants is a question upon which the learned counsel for the respective parties entertain radically different opinions, and which we are again called upon to determine. It is insisted with much earnestness on behalf of respondent that, when the original holders of these warrants received the amount of money mentioned therein from the treasurer from the fund upon which they were drawn, the warrants were thereby absolutely paid and extin-

guished, and no act or intention of the treasurer could give them any force or vitality thereafter. But we are of the opinion that the mere fact that the holder of a city warrant receives the money of the city, and delivers up the warrant to the regular disbursing officer, does not necessarily constitute payment, so far, at least, as such officer is concerned."

The court, discussing the question of payment in the light of the testimony in the case, cites numerous authorities to the effect that the question of payment is largely a question of intention, and concludes that, under the facts in the case, there under consideration, the transaction between the warrant holders and the treasurer was not a payment in satisfaction of the same. The reasoning, the authorities and the conclusion are applicable to the case at bar.

*The Mayor v. Ray,* 19 Wallace 468, is cited in support of appellant's position. The first paragraph of the syllabus is:

"A city corporation, the charter of which gave to it the usual powers formerly given to such corporations, but which did not give to it the power to borrow money, being, and for some time having been, pecuniarily embarrassed, issued its checks in form negotiable, and drawn by the mayor and recorder of the city on the city treasurer. The checks were presented to the city treasurer, and by him indorsed with his name and the date of his indorsement; it being the practice of that officer, in the then embarrassments of the city, thus to indorse checks when the city was not in funds to pay them in order that the checks might thereafter draw interest, as it was understood they would do. The checks were then taken by the holder and, according to a then prevalent custom to pay them for taxes, were paid to the treasurer of the board of education of

the city in discharge of school taxes. This officer (again, according to a then prevalent custom) sold them to A. (selling them for eighty cents on the dollar), and with the money discharged the salaries due by the city to the teachers of its public schools."

In the course of the opinion, it is said:

"The eighteen checks  *  *  *  had been received by the collector in payment of taxes due to the city. As evidences of indebtedness, where this was done, they were *functus officio*. They were paid and satisfied. They ceased to have any validity."

The above statement clearly distinguishes that case from the case at bar. There the checks or warrants were issued by the proper officers of the city in payment of its indebtedness, presented to the treasurer, by him indorsed and delivered to the holder, who paid them to the treasurer of the board of education of the city in discharge of the school taxes, who, thereupon, without authority of law, sold them at a discount in the open market. The reissue in that case was by the treasurer of the board of education after the warrants had performed the function for which they had been issued. No such state of facts appears in the case at bar.

*McConnell v. Simpson*, 36 Fed. 750, is cited. In that case the warrants were presented to the county treasurer, and by him redeemed with the public money, indorsed "Not paid for want of funds," and then put upon the market and sold. In the course of the opinion, the court said:

"The purchaser, if such there ever was, must have known that he had no right to the warrants issued to another, especially when found in the hands of the treasurer, whose duty it was to pay them, and who was forbidden by law to sell them. There was no honesty or good faith in the transaction. There could have been none. It was *malum*

*prohibitum*. It was about as bad as anything in that line could be, and the person or persons, whoever he or they may be, who received the warrants, stand in but little, if any better light, than Simpson himself.''

(From the opinion, it appears that Simpson, the treasurer, was, at the time of the trial, serving a term in the penitentiary for malfeasance in office, involving the transactions in suit.)

This authority is manifestly not in point.

Our conclusion is, that the warrants had not been canceled and reissued at the time they were deposited in the bank.

3. The warrants not being void in their inception, and not having been canceled and reissued, our attention not having been directed to any other reason for pronouncing them void, we conclude that the bank held them as valid obligations of the town, by purchase, upon receipt of notice from the town that the warrants would not be paid, there being funds in the treasury of the town for the payment of the same, the warrants being subject to call and payment as provided by the statute above quoted, was authorized to charge the amount of the warrants and interest thereon against any money then on deposit in the bank to the credit of the town.

A deposit with a bank, in the absence of terms which make it a special deposit, becomes immediately a part of the general assets of the bank, and the bank thereby becomes the debtor of the depositor for the amount of the deposit.

A bank has a general lien on all securities and moneys deposited with it by a customer, for its general balance, unless circumstances show an express or implied contract inconsistent with such lien.

When a bank holds a depositor's note, it has the right at any time during the day on which it falls due to apply funds in its hands, belonging to the depos-

itor, to the payment of the note. The same rule applies to other classes of commercial paper, and, under the facts of this case, is applicable to the warrants of the town held by the bank. The rule is thus stated in 3 Am. & Eng. Enc. of Law (2d ed.) 835:

"The right of the bank to apply deposits to the extinguishment of the depositor's indebtedness as it matures, grows out of the doctrine that the. relationship between bank and depositor is that of debtor and creditor. The bank holds a lien upon the deposits in its hands to secure the repayment of the depositor's indebtedness, and may enforce that lien as the debts mature, by applying the debtor's deposits upon them, thus setting the two off against each other."—*Bank v. Hughes,* 17 Wend. 94; *Scammon v. Kimball,* 92 U. S. 362; *Schuler v. Bank,* 27 Fed. 424.

The above principle has been recognized by this court in *Boettcher v. Bank,* 15 Colo. 16.

The action of the bank in the premises was right; the judgment is in accord with the views herein expressed, and will be affirmed.           *Affirmed.*

CHIEF JUSTICE GABBERT and Mr. JUSTICE GUNTER concurring.