THE STATE ex rel. WILLIAM G. KELLY et al. v.
GEORGE E. HACKMANN, State Auditor.

In Banc, August 6, 1918.

1. **CONTRACT WITH STATE: Proof of Existence: Finding by Legis-
   lature.** A finding by the Legislature of a fact upon which the right
   to enact a law depends is not to be further inquired into by the
   courts. So where an appropriation act appropriated a definite sum
   of money to private persons "in full payment of their claim against
   the State of Missouri for the plan submitted to the Board of Fund
   Commissioners for the sale of State Capitol bonds," and a contract
   for such a plan could under the statute have been made on behalf of
   the State with said board, it will be taken as true that an agreement
   was made between said persons and said board, under which the
   claim arose. And even if the court were to reserve the right to
   make an independent finding on the question of fact on the ground
   that the constitutionality of the act depends on a question of fact,
   the prior finding of the Legislature that such fact did exist would be
   treated as prima-facie true.
   *Held,* by WALKER, J., dissenting, with whom BOND, C. J., and
      WOODSON, J., concur, that the plan alleged to have been sub-
      mitted was rendered voluntarily. with no implied or express
      obligation on the part of the board to pay therefor, if the
      services tendered were not accepted, and the Constitution
      prohibits the Legislature to appropriate money for a mere
      submitted plan.

2. ———: **Presumption of Validity: Judicial Question.** The courts
   will ·presume that the Legislature passed upon the validity of an
   agreement made by the board which was empowered to make it
   on behalf of the State, before it appropriated money to pay the
   obligation which it expressed, unless it is 'deemed a clear violation
   of the Constitution; but, nevertheless, the validity of the agree-
   ment is a judicial question, and the act making the appropriation
   to pay the claim will not be upheld if the agreement is one that
   the Constitution makes null and void.

3. ———: **Fund Commissioners: Power to Contract.** Section 11900,
   Revised Statutes 1909, which authorized and empowered the Board
   of Fund Commissioners "to enter into contracts, and to refund any
   part of the bonded indebtedness of the State," when read in con-
   nection with Section 11890, which authorized them to "perform all
   such acts and things as may be required of them by law," and the
   amendment of 1913 to Section 11900, which "authorized and em-
   powered" said board "to enter into contracts and to refund," did

not restrict their duties to refunding bonds, but authorized them to make contracts for the sale of Capitol bonds authorized by the Act of March 16, 1911.

*Held*, by WALKER, J., dissenting, with whom BOND, C. J., and WOODSON, J., concur, that neither said statutes nor any other invested the board with authority to contract to pay for a plan to sell bonds voluntarily submitted to it and never accepted.

4. ———: **Necessary Incidents of Power.** In view of the inhibition of the Constitution (Sec. 24, art. 4) that the General Assembly shall have no power "to pay or to authorize the payment of any claim hereafter created against the State . . . under any agreement or contract made without express authority of law," the power of the Board of Fund Commissioners to enter into a contract relating to the sale of the State's bonds must be strictly construed, and no such broad meaning of the word "necessity" as "convenient" and "proper" is to be tolerated; but as the board was given express authority to sell the Capitol bonds and power to enter into contracts, they were also given, as necessary to the exercise of such power, the further power to enter into an agreement with private citizens to submit to them a plan to sell the bonds; and as the Legislature in an appropriation act recites that such plan was submitted, the act appropriating money to pay for the service rendered is not without express authority of law.

*Held*, by WALKER, J., dissenting, with whom BOND. C. J., and WOODSON, J., concur, that no appropriation act derives any operative force from its own terms alone, but something more, usually some statute, is necessary to authorize the withdrawal of money from the public treasury; and as the statute authorized the board to sell the bonds at the best advantage and required the proceeds to be applied exclusively to the building of a new capitol, furnishing the same and the acquirement of additional ground for a site, and the Constitution prohibits the Legislature to appropriate money in "payment of any claim . . . under any contract made without express authority of law," the Board of Fund Commissioners had no power to enter into a contract to pay for a plan to sell the bonds, and the General Assembly had no power to appropriate money to pay for a plan for their sale, voluntarily submitted by private persons and never accepted by the board, and no such power can be implied from the restricted language used, nor did any public necessity for the contract or the plan exist, and it is only when the public interest is involved that a necessity, as an incident to the power granted, can be said to exist.

5. ———: **Capitol Building Fund: Restricted Use.** The Capitol Building Fund having been increased from other sources than the proceeds of the Capitol bonds to an amount more than sufficient

to discharge the obligation of a contract for a plan for selling the bonds, it cannot be held, as a fact, that an appropriation to pay said obligation is a diversion of the proceeds of the bonds, whose proceeds were by statute devoted to erecting a capitol, furnishing it and buying additional ground for a site; nor can it be held, as a matter of law, that the use of the proceeds to pay said obligation would be a diversion of them, since such payment was a necessary expense of floating the loan and therefore not an unlawful use of the proceeds. [WALKER, J., BOND, C. J., and WOODSON, J., dissenting.]

6. ———: **Grant to an Individual: Constitutional Inhibition.** The restriction of Section 46 of Article 4 of the Constitution inhibiting the Legislature from granting public money to an individual, is laid upon gratuitous grants. It does not prohibit payment for services rendered the State; for instance, it does not prohibit the Legislature to appropriate money to pay private citizens for a plan submitted to the Board of Fund Commissioners to sell a large issue of bonds.

7. ———: **Certification of Claim.** The State Capitol Commission was not entrusted with the sale of Capitol bonds, nor did it have anything to do with claims or demands incident to their sale, and consequently it was not necessary that it allow or certify a claim by private persons for a plan to sell the bonds submitted to the Board of Fund Commissioners.

8. **JUDGMENT: Allowance in Excess of Demand.** Where the Legislature appropriated $25,000 to pay relator's demand, and they agreed with the Governor, prior to his approval of the act, to reduce their demand to $20,000, and they asked for a writ to compel the State Auditor to issue them a warrant for $20,000, and from a judgment against them in the circuit court they appeal, it would be inconsistent with the theory on which the case was tried and submitted in that court, for the Supreme Court to allow them $25,000.

Appeal from Cole Circuit Court.—*Hon. J. G. Slate,* Judge.

REVERSED AND REMANDED.

*George Kingsley, Reed & Harvey* for appellants.

(1) Courts reluctantly declare unconstitutional any legislative enactment. State ex rel. v. Gordon, 245 Mo. 35; State v. Smith, 233 Mo. 264; State v. Railway, 242 Mo. 354. (2) The contention of the State Auditor that all

the moneys in the Capitol Building Fund constitute a trust fund for the construction of the Capitol, the furnishing and equipment thereof, and that a warrant against the same cannot be drawn in favor of relators, and that attempt to do so would constitute an illegal diversion of the fund, is without merit.  Church v. Hadley, 240 Mo. 692. (3) Section 59 is not in contravention of Section 20 of Article 10 of the Constitution. Church v. Hadley, 240 Mo. 692. (4) The contention of the State Auditor that the act of appropriation to relators is in contravention of Sections 46 and 48 of Article 4 of the Constitution is without merit.  Ex parte Renfrow, 112 Mo. 591; Cutcher v. Crawford, 105 Ga. 180; Waterloo v. Shanahan, 128 N. Y. 345; Stevenson v. Colgan, 91 Cal. 649; Kadderly v. Portland, 44 Ore. 120; Davis v. Gaines, 48 Ark. 370; Hanson v. Hodges, 160 S. W. (Ark.) 395; In re Senate Resolution, 54 Colo. 270; Oklahoma City v. Shields, 22 Okla. 305; Lavin v. Bacon, 14 S. D. 405; Farquharson v. Yeargin, 24 Wash. 549; Lusher v. Sitz, 4 W. Va. 11; DeCamp v. Eveland, 19 Barb. 81.   (5) The undisputed facts in the case and the findings of fact by the trial judge completely demolish the defense that there is no money available in the Capitol Building Fund with which to pay relators, and that any payment thereof impairs the obligations of contracts between the State of Missouri and Kelly & Kelly and other persons.

*Frank W. McAllister*, Attorney-General and *John T. Gose*, Assistant Attorney-General for respondent.

(1)  In the extraordinary remedy of mandamus the following may be said to be elementary:  (a)  The writ is never granted in doubtful cases; (b) relator must establish his clear legal right; (c) where the underlying proceedings are unauthorized or illegal, the writ will be denied; (d) the writ will never issue where the act commanded would result in the violation of a constitutional provision.  High, Extraordinary Remedies, p. 12; 26 Cyc. 150, 151; 19 Am. & Eng. Ency. Law (2 Ed.), 725; State ex rel. v. Thomas, 245 Mo. 71; State ex rel,

v. Appling, 191 Mo. App. 592. (2) A fund set aside by direct vote, of the people for certain specific purposes is in the nature of a trust fund and cannot, by the General Assembly, be applied to any other purpose than that for which it was created, except by the consent of the people. In re Statehouse Fund, 19 R. I. 391; In re Statehouse Fund, 20 R. I. 707; Graham v. Horton, 6 Kan. 353; Trustees v. Bailey, 81 Am. Dec. 194; State ex rel. v. Cardozo, 28 Am. Rep. 274. (3) The act is violative of Section 20 of Article 10 of the Constitution. The Capitol Building Fund consists of moneys arising from a loan, debt or liability, and can only be applied to the purposes for which they were obtained, or to repay the indebtedness. The Legislature could not touch the fund for any other purpose. "Moneys arising from any loan, debt or liability contracted by the State shall be applied to the purposes for which they were obtained, or to the repayment of such debt or liability, and not otherwise." Sec. 20, art. 10, Mo. Const. (4) The act is in violation of Sections 48 and 46 of Article 4, Constitution of Missouri. There was no express authority of law for a contract or agreement with the Fund Commissioners for the submission of a plan, consequently the Legislature had no power to pass the act in question. Sec. 48. art. 4, Mo. Const.; State ex rel. v. Walker, 85 Mo. 47. The alleged contract or agreement being null and void, there was no liability created against the State, and the act of the Legislature was in effect a mere grant or gift to an individual. Sec. 46, art. 4, Mo. Const. (5) The act violates the obligations of State contracts. No state shall pass any law impairing the obligation of a contract. Sec. 10, art. 1, U. S. Constitution. No law impairing the obligation of contracts can be passed by the General Assembly. Sec. 15, art. 2, Mo. Constitution. "The obligation of a contract is found in the terms in which the contract is expressed." Barlow v. Gregory, 31 Conn. 265. Existing laws which touch and affect the subject matter of a contract are as much a part of the contract as if they were expressly written therein. 6 Ruling Case Law, sec. 243, par. 855;

Armour Packing Co. v. United States, 209 U. S. 56; 14 L. R. A. (N. S.) 400; Kessler v. Clayes, 147 Mo. App. 95; McCracker v. Haward, 2 How. (43 U. S.) 611. Constitutional provisions which deny to the state the power to pass laws impairing the obligation of contracts apply as well to contracts made by the state as to those made by individuals. Dartmouth College v. Woodward, 4 Wheat, 519; Cooley's Const. Limitations (6 Ed.), sec. 329; New Jersey v. Wilson, 7 Cranch, 164; Fletcher v. Peck, 6 Cranch, 135; Hartman v. Greenhow, 102 U. S. 672.

GOODE, Special Judge—An alternative writ of mandamus was issued June 12, 1917, by the judge of the circuit court of Cole County, commanding the respondent, as State Auditor, to sign and deliver to the relators, Kelly & Kelly, a warrant for twenty thousand dollars upon the Capitol Building Fund of the State, or to show cause in term time, for refusing. The writ was granted upon a petition containing these averments: The petitioners were partners under the style of Kelly & Kelly; the sum of twenty thousand dollars was appropriated to them out of the Capitol Building Fund by the General Assembly at its last session to pay money due petitioners by the State of Missouri; said appropriation was part of the General Appropriation Act and was approved by the Governor; prior to his approval petitioners agreed with him to reduce their claim to twenty thousand dollars; petitioners were and are willing to accept the State Auditor's warrant for that sum in satisfaction of the appropriation, had so advised him and had demanded that he issue a warrant in petitioner's favor in accordance with the terms of the appropriation, but he had refused.

The item of the General Appropriation Act of April 11, 1917, on which this proceeding is based, reads:

"There is hereby appropriated out of the State Treasury chargeable to the Capitol Building Fund the sum of twenty-five thousand dollars for the relief of Kelly & Kelly of Kansas City, Missouri, in full pay-

ment of their claim against the State of Missouri for the plan submitted to the Board of Fund Commissioners for the sale of State Capitol bonds.'' [Laws 1917, p. 21, sec. 59.]

That part of the Appropriation Act is the only evidence in this case of an agreement between relators and the State and of what the agreement was.

In his return to the writ the State Auditor set forth ten reasons why he had not issued the warrant in question and should not. be compelled to issue it. They were in substance as follows:

A denial that the appropriation was to pay money due to the relators from the State, or that there was any money in the Capitol Building Fund to pay a warrant for the appropriation;

Averments that the Capitol Building Fund was in the nature of a trust fund, set apart by a vote of the people for these specific purposes, first, to build a new State Capitol; second, to furnish and equip it; third, to purchase any additional premises that might be needed as a site for the Capitol; that, therefore, the Legislature was without power to divert any part of the Capitol Building Fund to other purposes;

That as the Capitol Building Fund consisted of money derived from a liability contracted by the State, for the three purposes aforesaid, it could not be appropriated for any other than those. purposes, or to repay the debt of the State, without violating Section 20 of Article 10 of the State Constitution. This section of the State Constitution provides, in effect, against the use of any money arising from a loan, debt or liability contracted by the State, for any purposes other than that for which the debt was contracted, or for the repayment of the debt;

That the appropriation for relators was contrary to the provisions of Section 48 of Article 4 of the Constitution, which reads: ''The General Assembly shall have no power to grant, or to authorize any county or municipal authority to grant any extra compensation, fee or allowance to a public officer, agent, servant or

contractor, after service has been rendered or a contract has been entered into and performed in whole or in part, nor pay nor authorize the payment of any claim hereafter created against the State, or any county or municipality of the State, under any agreement or contract made without express authority of law; and all such unauthorized agreements or contracts shall be null and void.''

That the appropriation amounted to a grant to the relators of public money, in violation of the inhibition of Section 46, Article 4, of the State Constitution;

That the appropriation impaired the obligation of contracts previously made by the State, for the construction and furnishing of the Capitol, and finally,

Averments to the effect that the claim of relators for which the appropriation was made, did not arise under a contract made with the State Capitol Commission Board, nor was the relators' demand allowed and certified by said board, in conformity to the act creating the board. [Laws 1911, p. 108 et seq.]

A replication in the form of a general denial of the return was filed.

At the hearing in the circuit court it was admitted there was then in the Capitol Building Fund $707,844.87; that said fund (i. e. the amount then in it and what had been in it)consisted of the proceeds of the sale of bonds of the State authorized by act of the General Assembly (see Laws 1911, pp. 406-417), together with funds placed in it under Section 16-A of the Act of the General Assembly relative to contingent and incidental expenses for years 1915-1916 (Laws 1915, p. 9). It was admitted the additional sum of $27,500 had been transferred to the Capitol Building Fund pursuant to said Section 16-A (Laws 1915, p. 9) and that $21,000 derived from the rent and sale of buildings on the Capitol grounds had been added. There were admissions relative to submitting to the popular vote the Act of March 16, 1911 (Laws 1911, pp. 416-417), providing for contracting a liability of the State through an issue of bonds to a maximum of three and a half million dollars, to provide

means to build a capitol, furnish and equip it and purchase additional premises for it; that the act of submission was approved March 24, 1911 (Laws 1911, pp. 250-254); and that the bond issue, for the purposes mentioned, received a two-thirds majority of the voters voting at the election.

Evidence was put in by the respondent to show contracts the State was under for building the Capitol and the amount of the State's liability under them; also that other contracts would be necessary in the future in order to complete, light and furnish the Capitol.

The trial court found that when the Appropriation Act was approved and at the time of the hearing, there was enough money in the Capitol Building Fund to pay a warrant for $20,000 in favor of relators, and that, too, without impairing the obligation of any contract in existence when the appropriation was approved or when the cause was heard.

The alternative writ was quashed in the circuit court and relators appealed.

By way of further explanation we state that the issue of State bonds to construct, furnish and equip a new capitol building was authorized by an Act of the General Assembly approved March 6, 1911. (Laws 1911, p. 416). That act provided for the contracting of a liability of the State by an issue of bonds, not to exceed three and one-half million dollars, for a submission of this act to a vote of the people as required by Section 44, Article 4, of the State Constitution, prescribed the denominations of the bonds, mode of authenticating them, and further provided as follows: "Said bonds, when so prepared and executed under the supervision of the State Board of Fund Commissioners, shall be sold to the best advantage by said board, but not for less than par. The proceeds of said sale or sales shall constitute a fund to be designated as the Capitol Building Fund, and shall be applied exclusively to the building of a new state capitol at the present seat of government of the State, including the furnishing and other equipment of said building and the purchase by

the State of additional capitol premises adjoining those now owned by the State;" and further that "contract or contracts for expenditures to carry out the purposes of this act in excess of said three and one-half millions of dollars, with interest collected thereon, shall, to the amount of said excess, be illegal and void and forever non-payable." An act submitting the foregoing act to a popular vote was approved March 24, 1911 (Laws 1911, p. 250).

The proposition mainly relied on by respondent as a defense is, that the appropriation to pay the claim of relators violated that clause of the State Constitution quoted above, which forbids the General

**Contract With State.** Assembly to pay or authorize the payment of a claim created against the State under any agreement or contract made without express authority of law, and declares all such unauthorized agreements and contracts shall be null and void. The claim of relators is of a kind that could only accrue from a contract, and whatever may have been the contract out of which the claim arose, it must have been made between the relators and the State acting through the Board of Fund Commissioners, as it is apparent from the recital in the Appropriation Act that the purpose of the particular item was to pay relators for a plan for the sale of the State Capitol bonds, submitted by them to that board. Moreover, if a contract of the kind in question was possible, it could only have been made with the said board, which was the body of officials charged with the task of selling the bonds, by the act that authorized them.

There are two inquiries to be answered in determining whether or not the claim of relators was created against the State under a valid agreement. *First,* is there proof in the record that an agreement was entered into by the relators with the Board of Fund Commissioners for the former to submit a plan to sell the bonds? *Second,* if there is, did the board possess express authority of law to make the agreement, or was it a mere nullity for lack of authority?

In cases where the courts have reserved the right to make an independent finding of facts when the constitutionality of a statute turned upon. a question of fact, the prior finding of the Legislature was treated as prima-facie true. [N. Pac. Ry. v. N. Dakota, 216 U. S. 579; Judson, Interstate Commerce (3 Ed.), p. 224.] And there is abundant authority in this State and elsewhere for holding that a finding by the Legislature of the existence of a fact upon which the right to enact a law depended, is not to be further inquired of by the courts. [Ex parte Renfrow, 112 Mo. 591; and cases cited in opinion.] So we will take it as true that an agreement was made between the State and relators under which their claim arose. We should presume, too, that the Legislature passed upon the validity of the agreement before making the appropriation in controversy. Nevertheless, that question remains judicial, the legislative decision being so far respected that the act passed to pay the claim based on the contract, will be upheld by the court, unless deemed to be a clear violation of the Constitution. The constitutionality of statutes, other than those of a political character, must be judicially determined, when called into question in litigation, as has been often decided in cases like the present. [State ex rel. v. Walker, 85 Mo. 41; State ex rel. v. Dierkes, 214 Mo. 578, 587.]

Proceeding to the inquiry whether it was possible for the contract in controversy to have been made by express authority of law, we note that the Board of Fund Commissioners is composed of the Governor, Auditor, Treasurer and Attorney-General, and that it is part of the Treasury Department, created by an act of the Legislature approved March 25, 1891. [Laws 1891, p. 16.] This act, as amended in a few particulars, constitutes the 3rd Article of Chapter 121 of Revised Statutes of 1909. One amendment was made to provide a plan to refund the State Capitol bonds (Laws 1913, p. 772); but we do not consider the change thus made as controlling the decision of the point in this case which arises on the act. The 13th section of the Law as it

was passed in 1891 and which is now Section 11900, Revised Statutes 1909, reads as follows:.

"The Board of Fund Commissioners are hereby authorized and empowered to enter into contracts, and to refund any part of the bonded indebtedness of the State, whenever they can do so to the advantage of the State in reducing the rate of interest of the outstanding State bonds, and to this end they are authorized and empowered to cause new bonds to be prepared, issued, sold or exchanged for outstanding bonds of such denominations, dates and rate of interest as they may deem proper, payable at such times and places, principal and interest, as they may agree upon as being to the best interests of the State: *Provided, always,* that the rate of interest of said bonds to be issued shall not exceed three per centum per annum, and that such 'refunding bonds' fall due, or become redeemable at the pleasure of the State, at such dates as will permit the redemption or payment, at par, of at least two hundred and fifty thousand dollars of the bonded debt of the State every year, until all of the bonds of the State are paid off. All bonds or State certifications of indebtedness hereater issued by this State under the direction of the Board of Fund Commissioners shall be signed by the Governor, countersigned by the Secretary of State, with the great seal of the State attached, and the coupons for interest shall have a facsimile of the State Treasurer's signature engraved thereon. The bond shall be registered by the State Auditor, to which he shall certify on each bond, and authenticate such registration by his signature and his official seal attached."

That section was altered, as stated, in 1913, by inserting certain provisions about the State Capitol bonds. The question is whether the clause authorizing the Board of Fund Commissioners to enter into contracts, conferred on the board the right to make contracts regarding any duty that might be committed to them by law, or only regarding the refunding of State bonds. Most of the section relates to refunding, but in a prior section (now Sec. 11890, R. S. 1909) it was pro-

vided that the Fund Commissioners should do "and perfom all such acts and things as may be required of them by law," and various duties other than refunding duties were required of them; and in fact, they were charged with a supervisory control over the Treasury Department. The first clause of the 13th section (now Sec. 11900), which empowered the Fund Commissioners to enter into contracts, instead of reading that the board was authorized and empowered to enter into contracts to refund, etc., reads that they are "authorized and empowered to enter into contracts and to refund," etc. The only reason for thinking the right to contract was given solely to enable the board to discharge their refunding duty is, that the right was given in the same part of the act that provided for those duties. But the Legislature contemplated from the first that the board should perform other duties, and duties which, as may be seen by reading the act, would call for agreements; for instance, the selection of a bank as fiscal agent for the State (3 R. S. 1909, sec. 11894). If it is held that the power of the commissioners to contract, given in the 13th section, was meant to apply only in refunding cases, then on the maxim that the mention of one thing inferentially excludes others, it could be argued that the commissioners were without power to make contracts, whatever the necessity for them, as to any other task that might be imposed on them by law. The reasonable construction of the act is that the Legislature intended to vest this body of officials with authority to enter into contracts according to their judgment, not regarding any public matter whatsoever, but regarding any that might be entrusted to their management—to enter into such contracts as would enable them to perform, not only their refunding duties, but their other duties as well. As the selling of the Capitol bonds was given in charge to the Board of Fund Commissioners, it follows that the contract in question, entered into in connection with the effort to sell, was made by express authority of law, unless the right of the Fund Commissioners to contract in the particular

matter was withdrawn by later statutes; and there is none claimed to have that effect, except those that provide for the Capitol bond loan; particularly the clause requiring the bonds to be sold for not less than par.

In the case of Church v. Hadley, 240 Mo. 680, decided in 1911, this court, without passing upon the effect of said Section 11900, Revised Statutes 1909, held the Fund Commissioners had express authority to contract for help to sell the Capitol bonds, by reason of these facts: first, that their efforts to sell without help had demonstrated it was impossible to do so; second, the urgency of the need to sell in order that the State's archives might be safely housed. The two opinions in the case were both concurred in by a majority of the court, and the gist of them was that an emergency existed which created a necessity for help in selling the bonds, "and that such necessity is within the intendment of the statutes," namely, the statutes which authorized the bonds. The decision was based both on an interpretation of those statutes and on adjudications in other states wherein the right of officials to agree to pay a commission for the sale of public securities was held to have been conferred by laws authorizing them to sell. [Armstrong v. Village of Fort Edward, 159 N. Y. 315; Mayor, etc. v. Sands, 105 N. Y. 210; Manitou v. First National Bank, 37 Colo. 344; State v. West Duluth Land Co., 75 Minn. 456.] It would be difficult to sustain the proposition that at common law, an agent appointed to sell property, as the Fund Commissioners were, was empowered merely by virtue of his appointment, to bind his principal by contracts with third persons to help him sell, even if it should turn out that he could not sell without help. [2 Cor. Jur., p. 595, and note 13; 9 Cor. Jur. p. 519, and note 95; Mechem, Agency, sec. 357; Atlee v. Fink, 75 Mo. 100; Carroll v. Tucker, 2 N. Y. Misc. 397.] Nor did the decision in Church v. Hadley announce as a rule of general application, that agents might do this; but, instead, took pains to declare that the decision stood on all the facts of the particular case

(l. c. 706). The exact question determined therein was as to the right of the Fund Commissioners to agree to pay a broker's commission for sale of the bonds, whereas here the question is of their right to contract for a plan to sell the bonds. In our judgment, the difference between the two agreements does not call for a different rule of decision in the present case, inasmuch as both agreements were expedients resorted to by the Fund Commissioners as necessary, in their judgment, to enable them to perform their duty to sell the bonds—the identical issue of bonds and the same conditions existing in each instance.

The argument is pressed at this point that in Church v. Hadley, the court was not dealing with an appropriation to pay a claim against the State, and was neither bound to nor did consider the provision of Section 48, Article 4, of the State Constitution, which forbids the payment of any claim against the State created under a contract made without express authority of law. It is true, there was no discussion in the opinion of that clause of the Constitution, but the court carefully inquired as to the authority of the Fund Commissioners to agree for the help of brokers, and found such authority was part of the express grant of power to the commissioners to sell the bonds. It is appropriate to refer here to cases which support that doctrine by analogy and to others which support it by judgments directly in point. It will be conceded that the power of officials charged with a ministerial duty are

**Necessary Incident.** strictly construed and that such broad meanings of the word necessary (namely, "convenient" or "proper") as have been adopted in ascertaining from grants to legislative bodies what powers passed by implication as necessary to the effective use of those mentioned (M'Culloch v. Maryland, 4 Wheat. 316) have not been accepted (Mechem, Public Officers, secs. 511, 522; State v. Bank of Missouri, 45 Mo. 528, 538; Whiteside v. United States, 93 U. S. 247, 257). But tried by the strict meaning of "necessary," some powers not mentioned will pass by a grant, just as an

appurtenant easement will go with a conveyance of an estate though not mentioned in the deed. [Kent v. Waite, 10 Pick. 138.] A statutory appropriation of funds to a Highway Commissioner, wherewith to build roads, expressly carried the right to purchase materials and tools for use in building, though nothing was said in the statute about purchases for that purpose, whereas they were directed to be made for the repair of roads. This was decided in construing a constitutional clause like the one in hand. [Townsend v. Gash, 267 Ill. 578.] And dealing with the same provision, it was held that supervisiors charged to inspect the books and accounts of county officers were expressly given the right to hire an expert accountant, for the reason that, as they were not experts, it was impossible otherwise for them to perform their task. [Harris v. Gibbins, 114 Cal. 418.] Supervisors appointed to examine and allow accounts are thereby empowered to reject accounts, and a commission to erect a public building carries the right to engage for labor and material. [People v. Supervisors, 9 Wend. 508; Danolds v. State, 89 N. Y. 36.] Implied or incidental powers like those examples, can be derived from an express grant without extending the word "necessary" beyond its usual meaning of an indispensable condition or requisite; and, as the implied powers are considered to have been embraced in the grant, without ignoring the meaning of "express" in the law as the antithesis of "implied."

In the light of the foregoing arguments and precedents, we think the constitutional provision in question was not adopted with the intention to abrogate the doctrine of the common law that incidental powers may accompany the grant of an express power, as necessary to the exercise of the latter; but to enforce the rule of strict construction in determining what agreements public agents and officials are given the right to make, in connection with the performance of some duty imposed on them, when such subsidiary agreements are not mentioned in the law imposing the duty.

Moreover, though the court in Church v. Hadley did not determine the effect of the constitutional provision in hand, upon the right of the Fund Commissioners to contract for help in selling the bonds, it did determine, as said before, that they had the right to do this by virtue of the statute which directed them to sell; and the court having so determined, it follows, of course, that an appropriation to pay for the assistance thus procured would not be unconstitutional, on the ground that the contract was made without express authority of law.

The second and third answers in the return present, in two phases, the proposition that the Capitol Building Fund consists of the proceeds of the Capitol bonds, which proceeds had been devoted by the statutes authorizing the bonds to the threefold purpose of erecting a State capitol, furnishing and equipping it and buying premises to enlarge the site; that the loan had been ratified by the voters of the State upon the condition that the proceeds of it should be thus used, and therefore a diversion of any portion of the proceeds to another use would be unlawful. In support of this proposition as a general rule of law, independent of any constitutional inhibition, several decisions are cited, and as enforceing the same rule, a clause of the Missouri State Constitution. [In re State House Fund, 19 R. I. 391, 20 R. I. 707; Graham v. Horton, 6 Kan. l. c. 353; Trustees v. Bailey, 81 Am. Dec. 194; Mo. Constitution, art. 10, sec. 20.] There are two answers to this contention, one of fact, the other of law. The evidence in the record, and indeed the admission of the parties, show that the Capitol Building Fund, against which the appropriation for relators was made, has been increased from other sources than the proceeds of the Capitol bonds, to an amount more than sufficient to discharge the appropriation. Besides, the effect of the decision in Church v. Hadley is that one of the purposes in contemplation when the Capitol loan was made, was payment of the necessary expense of floating the loan out of its proceeds, and therefore such

*Proceeds of Bonds.*

payment would not be an unlawful use of the proceeds.

The language in which the General Assembly made the appropriation answers the contention that it was a grant of public money within the inhibition of Section 46 of Article 4 of the Constitution. The ap-

**Public Money.** propriation purports to be made to pay a claim of relators against the State for a plan submitted to the Board of Fund Commissioners to sell the bonds; that is, to pay for a service rendered the State, and one for which, so far as the last cited section of the Constitution is concerned, the Legislature might pay as lawfully as any other. The restriction of the Constitution is laid upon gratuitous grants of public money. [Stevenson v. Colgan, 91 Cal. 649.]

The defense that the Auditor had no right to issue the warrant in question, because the State Capitol Commission Board had not allowed or certified relator's

**Certification of Claim.** claim, calls for an interpretation of the act that provided for said board and defined its duties and the correlative duties of the State Auditor (Laws 1911, p. 108). The powers and duties of the board as given in the act relate to the acquisition of Capitol premises, selection of a place for the Capitol itself, contracts for its construction, and allowing and certifying to the Auditor bills in connection with those duties. The State Capitol Commission Board were not entrusted with the sale of the Capitol bonds, nor had they anything to do with claims or demands incident to their sale. Whatever expense might be incurred lawfully by the Fund Commissioners in selling, could be paid under a proper appropriation act, without previous action by the Capitol Commission Board.

The defenses of respondent that there was no money in the Capitol Building Fund to pay relators' claim, and that to pay it would impair the obligations of contracts made by the State, are answered by the findings of the trial court, which are supported by the evidence.

The demand of the relators made in their brief for relief to the amount of $25,000 cannot be allowed in the

face of their agreement with the Governor to accept $20,000, and their petition for a writ to compel the issuance of a warrant for the latter amount. This case is here on appeal, and it would be inconsistent with the theory on which it was tried and submitted below, to treat it as a proceeding to recover more than they originally demanded.

**Allowance In Excess of Demand.**

The judgment is reversed and the cause is remanded with direction to the circuit court to reinsert it in the docket and issue a peremptory writ of mandamus to the respondent to issue. a warrant in favor of relators in the sum of $20,000. *Faris, Williams* and *Graves, JJ.*, concur; *Walker J.*, dissents in separate opinion, in which *Bond, C. J.*, and *Woodson, J.*, concur.

WALKER, J. (dissenting)—I do not concur in the majority opinion. The Appropriation Act the validity of which we are called upon to determine in this case, is as follows:

"Sec. 59. *Relief of Kelly and Kelly.* There is hereby appropriated out of the State Treasury chargeable to the Capitol Building Fund the sum of twenty-five thousand dollars for the relief of Kelly & Kelly of Kansas City, Missouri, in full payment of their claim against the State of Missouri for the plan submitted to the Board of Fund Commissioners for the sale of State Capitol bonds."

It is not inappropriate to state generally, preliminary to a discussion of the facts in this particular case, that no appropriation act under our system of laws derives any operative force from its own terms alone. As we will demonstrate, something more is necessary to authorize the withdrawal of funds from the public treasury than a mere arbitrary declaration of the General Assembly for that purpose. This being true, we must look to other than this act itself in determining its validity. A confusion in terms may be avoided by keeping in mind that the appropriation will be referred to as "the act," and the law it designates as creating the fund from which the appropriation is sought to be

made, as "the statute." To this statute we must look
in determining the validity of the act. The pertinent
parts of this statute necessary to the determination of
the matter at issue are embraced in a few words. It con-
fers power upon the Board of Fund Commissioners to
sell the bonds therein provided for at the best advantage,
but for not less than par. The proceeds arising there-
from are designated as the "Capitol Building Fund,"
to be applied exclusively to the building of a new State
Capitol at the present seat of government of the State,
including the furnishing and other equipment of said
building. [Sec. 1, Laws 1911, pp. 250, 416.] The effect
of the act is to appropriate a portion of the Capitol
Building Fund to the payment of the claim designated
therein. In the absence of a constitutional limitation,
this would be sufficient to set the seal of legality upon
an act of this character, because the Legislature is
supreme within its own appointed sphere. This being
true, the presumptive validity of its acts not only uni-
formly obtains, but continues until their invalidity is
shown beyond a reasonable doubt. This rule of non-
interference of the judiciary with legislative action,
in harmony with the spirit and purpose of our institu-
tions, has found frequent expression in our reports.
Notably in the following cases: State ex rel. v. Aloe, 152
Mo. l. c. 477; Edwards v. Lesueur, 132 Mo. l. c. 430;
State ex rel. v. Wofford, 121 Mo. l. c. 68; State ex rel.
v. Renfrow, 112 Mo. l. c. 594; Deal v. Mississippi Co.,
107 Mo. l. c. 468. The rule as announced in these
cases and many others of like tenor is clear and definite,
leaving no room for controversy. In none of these
cases, however, was the validity of an appropriation
act involved. Such acts are hedged about with constitu-
tional limitations with which the Legislature must com-
ply to render them valid. When, therefore, an act of
this character is submitted for judicial analysis, the
presumption as to its validity will obtain at first view,
as in the case of other enactments, but it should be
scrutinized to determine if it conforms to the express
requirements of the Constitution. Such scrutiny in

nowise interferes with the authorized freedom of legislative action, but is nothing more than the legitimate exercise of an affirmative duty enjoined upon the judiciary—a duty imminently imperative where, as here, it is evident from the face of the act that its purpose is to appropriate part of a public fund created for a specific purpose, to the payment of a private claim. Furthermore, the fund from which this appropriation seeks payment was not created by the ordinary processes of taxation, burdensome at best, but under a statute which required the approval of the electorate to render it operative. The will of the people directly expressed as well as that of their representatives is therefore embodied in the statute. This statute creates a burden imposed solely on account of the exigency occasioned by a great public calamity; and in this creation it is not to be presumed, in view of the restrictions of the Constitution, that it was intended that the fund arising from a compliance with its conditions should be expended other than in accordance with its well defined terms. In a case of this character there is no room for presumptions. The restrictive limitations of the Constitution, therefore, necessary to be observed on construing the statute creating the Capitol Building Fund and, as a consequence, its application to the act of appropriation, demand our considerate examination.

Section 48 of Article 4 of the Constitution, so far as same is applicable to the matter at issue, is as follows:

"The General Assembly shall have no power to pay or authorize the payment of any claim hereafter created against the State, under any contract made without express authority of law; and all such unauthorized agreements or contracts shall be null and void."

This provision is mandatory and like any other constitutional provision of like nature (St. Joe Ry. Co. v. Shambaugh, 106 Mo. l. c. 571) it inserts itself into all appropriation acts, and a compliance with its mandate is a prerequisite to their validity. What are the terms, therefore, of the statute upon which this act must rely

for its legality? Their repetition will but serve to emphasize their explicit purpose. They are that the Board of Fund Commissioners shall sell the bonds "from which the fund is to be created for not less than par," and that "the proceeds of said sale or sales shall constitute a fund to be designated as the Capitol Building Fund, and shall be applied exclusively to the building of a new state capitol at the present seat of government of the State, including the furnishing and other equipment of said building and the purchase by the State of additional capitol premises adjoining those now owned by the State." [Sec. 1, Laws 1911, p. 416.] This is the statute in its own words, omitting therefrom certain subsequent provisions which even with the longing eyes of private acquisition cannot with any regard for the acknowledged meaning of words be construed as having any pertinence to the matter at issue. We submit that the language of this statute contains nothing which can be construed as authorizing this appropriation even under the most latitudinary construction; but such a construction, the ultimate result of which is a reliance upon implied power, will not suffice to give legal life to the attempt made by this act, to divert a portion of this fund from the evident purpose of its creation. This for the reason of the unequivocal language of the Constitution, which prohibits any appropriation in the absence of an *express provision of law* authorizing the same. The language thus employed is neither finical nor redundant, but expresses in clear and forcible words the purpose of the framers of the organic law. The word "express" is employed in the limitation to exclude any power that might be sought to be exercised by implication. This is evident not only from the meaning of the word itself, but from its connection and the purpose intended to be effected by the adoption of this restriction. The reason of the law is the life of the law. This rule applies to constitutions as well as to statutes; and while this constitutional provision needs no gloss, a reference to the numerous acts

275 Mo.—42

showing the indiscriminate. appropriation of public money before the adoption of the present Constitution, will historically and indubitably demonstrate the reasons, not only for this limitation as well as others upon legislative action in this regard, but that the words employed in expressing it have been carefully chosen and were used with a well defined purpose. This being true, if we keep in view the purpose intended to be accomplished by the framers of the Constitution in this limitation, and we read the words according to their plain unmistakable meaning, the conclusion is inevitable that the power to make this appropriation, under the statute, did not exist.

A contrary conclusion finds no support in either the reasoning or the conclusion reached in Church v. Hadley, 240 Mo. 680. The argument is that case while recognizing the supremacy of the General Assembly in its own field as one of the co-ordinate branches of the government, nowhere holds that the courts may not with discriminating care and a quickened conscience, especially where the interests of the State are concerned, examine every act of the appropriation of public money submitted for their review to determine its validity. In so doing they but comply with a sworn duty, and in no respect do they interfere with legislative supremacy, which in this class of cases does not exist until after the acts have received judicial approval, if submitted for that purpose. The Church-Hadley case did not involve the construction of an appropriation act, and hence the provision of the Constitution (Sec. 48, Art. 4) affirmatively restricting legislation of this character was neither considered nor construed. The ruling in that case conferring power upon the Board of Fund Commissioners to pay a commission for the sale of the the Capitol Fund bonds was based upon public necessity, and properly so, and not upon any power to be inferred from the language of the statute. Confined to the latter, no rule of construction would have authorized the holding of such a power by implication. A recital of the facts in the Church-Hadley case will demonstrate the wisdom

and correctness of the conclusion reached therein, and by differentiation show that a like conclusion is not authorized in the case at bar. The proceeding was by injunction to restrain the Board of Fund Commissioners from paying a commission for the sale of Capitol Fund bonds, which, if granted, would have resulted in paralyzing all previous acts of the General Assembly and of the people to repair the loss occasioned by the burning of the State Capitol. The only act remaining unperformed to secure the necessary funds to repair the loss was the conversion of the bonds into cash. It was conceded that while the power of sale was conferred upon the board, it was unreasonable to conclude that its members could unaided accomplish this end. The court held, therefore, that the statute being full and complete in all other respects, and the State being confronted not only with great loss, but a serious inter-- ference with its functions unless the bonds were promptly sold, the board would not be restrained from effecting their sale in any manner it deemed most feasible, and if in its wisdom, it found it necessary to pay a commission to brokers to effect the sale, that this might be done. The decisive ruling in the case, therefore, whatever other matters may appear *arguendo,* is this (p. 707): that "the power to pay a commission springs only from an emergency creating such necessity, and that such necessity is within the intendment of the statute." Five of the judges concurred in this conclusion, *Valliant* and *Brown, JJ.,* not voting. Thus it will be seen that the ruling was based upon necessity, and not upon a power created by implication, and cannot be considered a precedent in the case at bar. The latter cannot be sustained upon the doctrine of necessity, because this can only be invoked when the public interest is involved. It cannot be urged as a moral claim, because the plan alleged to have been submitted was rendered voluntarily with no implied or express obligation on the part of the board to pay therefor, if the services tendered were not accepted. It cannot be urged on legal grounds, because the board

was without any authority to contract for such an offer, and as a consequence the claim forms no basis for a right of action, if the State could be sued. A claim of this character is contrary to usage, custom and business experience, of all of which we are authorized to take judicial notice. No enterprise of moment, whether it be the sale of public securities or an employment of a fiscal or industrial character, is ever inaugurated, especially by a state or subordinate municipality, in which competitive propositions for undertaking same are not required to be submitted. Heretofore, demands for compensation in such cases have been limited to those who, being employed, had rendered service. This claim is, therefore, a novelty even in the ever extending field of business activity, the moving impulse of which is to set a price on everything.

Liberal as our Legislatures have been in the appropriation of public money, the approval of a claim for an offer to perform a service for the State has heretofore been unheard of. Certain it is, that no claim such as this, in the very teeth of the Constitution, has received the sanction of the courts. Given judicial approval, it will set the pace for a most pernicious practice, and hereafter, not one, but all of the unsuccessful bidders for state employment, will seek legislative intervention to secure compensation, not for services rendered, but for plans proffered.

This claim, therefore, is not only unauthorized, but unconscionable, and it should not be approved. *Bond, C. J.,* and *Woodson, J.,* concur in this opinion.