THE STATE EX REL. STRATTON SHARTEL, Attorney-General, v. HENRY J. WESTHUES, Judge of Circuit Court of Cole County (Two Cases with Same Title, Numbered 29,178 and 29,179).—9 S. W. (2d) 612.

Court en Banc, September 26, 1928.

1094

*Stratton Shartel,* Attorney-General, and *Smith B. Atwood* and *L. Cunningham,* Assistant Attorneys-General, for relator.

*Irwin & Bushman* for respondent.

BLAIR, J.—Certiorari to review two judgments of the Circuit Court of Cole County. Respondent waived service of notice and issuance and service of our writ in each case and accepted the petitions of relator and exhibits attached thereto as and for our writs. Certain stipulated facts and other facts alleged in the pleadings are taken as true. Oral argument was waived in each case. They have

been submitted on briefs of counsel and can be disposed of in one opinion.

Relator is Attorney-General of Missouri; respondent is Judge of the Cole County Circuit Court, and Charles U. Becker, mentioned in the pleadings, is Secretary of State.

I. We quote from relator's petition in case No. 29178 (case No. 5845 in the circuit court), as follows:

"Relator further states and shows that on the 2nd day of July, 1928, there was filed in the office of the Secretary of the State of Missouri a petition duly signed by more than eight per cent of the qualified voters in each of more than two-thirds of the Congressional districts of the State of Missouri, proposing an amendment to the Constitution of the State of Missouri, to authorize the incurring by the State of an indebtedness of $75,000,000 and the issuance of bonds of the State therefor, and that the Fifty-fourth General Assembly of the State of Missouri, by joint and concurrent resolutions, approved April 6, 1927, proposed an amendment to the Constitution of the State of Missouri; that each of said proposed amendments to the Constitution of the State of Missouri shall be submitted to the qualified voters of the State for adoption or rejection at the general election to be held in this State on the first Tuesday after the first Monday in November in the year 1928.

"Relator further states that it became and was and now is the duty of said Charles U. Becker as Secretary of the State of Missouri to cause said proposals for the amendment of the Constitution of this State to be published according to law and to designate a newspaper in each of the several counties of the State and in the city of St. Louis in which the same should be published; that said Charles U. Becker as such Secretary of State was proceeding to execute and perform the duties thus devolving upon him on the 6th day of August, 1928, on which date there was filed in the Circuit Court of Cole County, Missouri, and before Honorable Henry J. Westhues as judge, thereof, a petition for injunction to restrain said Secretary of State from publishing said proposed amendments. in which John Fugel . . . et al., are plaintiffs, and Charles U. Becker, Secretary of the State of Missouri, is defendant.''

It is then alleged that respondent issued a temporary injunction and, after certain proceedings, made the temporary injunction permanent, and refused, on motions for new trial and in arrest of judgment, to set the same aside.

The theory of the petition filed by plaintiffs John Fugel and others (case No. 5845 in the circuit court) is:

"That by virtue of the provisions of Section 10402, Revised Statutes 1919. it becomes and is the duty of the Secretary of State in

the publication of said proposed amendments to accept the most advantageous terms that can be obtained, not exceeding in any instance the rate of one dollar per square for the first insertion of 250 ems and fifty cents per square for each subsequent insertion and for the fractional squares in the same proportion; that it is the duty of the Secretary of State when letting contracts for the printing of constitutional amendments to award the same to the lowest and best bidder to some newspaper in each county in the State of Missouri.''

We further quote from said petition, as follows:

''Plaintiffs say that heretofore the said Charles U. Becker has refused to award the printing of said proposed constitutional amendments to the lowest and best bidder, but has arbitrarily and without warrant or authority of law let said contracts to favored publications at the maximum rate prescribed by law and has refused to accept bids and publish said amendments when submitted to him for less than one-third of the maximum rate prescribed by law; that he has caused the State of Missouri and the taxpayers thereof in the past six years to expend more than $500,000 in payment for said publications, and whereas if the said Charles U. Becker had complied with the laws of the State of Missouri and especially the provisions of Section 10402 he would have saved the State of Missouri more than $300,000.

''And your petitioners further say that unless enjoined and restrained from so doing the said Charles U. Becker will hereafter enter into contracts with various persons, firms and corporations publishing newspapers to publish the proposed constitutional amendments which have been proposed by the last General Assembly at the maximum rate of one dollar per square for the first insertion and fifty cents per square for each subsequent insertion without submitting the same to the various newspapers for bid without awarding it to the lowest and best bidder. Your petitioners say that in the counties of the State of Missouri there are more than one newspaper and in a great many of the counties of the State of Missouri there are a number of publications and if said publication is submitted to bid the plaintiffs say that it will result in a large saving in the cost thereof and thereby relieving the taxpayers of the State of Missouri from paying an exorbitant rate for said publication.

''And plaintiffs further say that the said Charles U. Becker is threatening and is now about to enter into contracts with various newspapers throughout the State of Missouri for the publication of said constitutional amendments now about to be submitted to the people to be voted on at the November election, 1928, wherein and whereby he will agree in said contracts to pay to the publishers of said constitutional amendments the maximum amount allowed by law for said publications and unless enjoined and restrained from so doing he will enter into pecuniary obligations upon the part of the State

of Missouri to pay for said publications at the highest rate prescribed by the statutes and will not submit said amendments to various publications for bids and will not award contracts to the most advantageous bidders, but will arbitrarily, wrongfully and unlawfully award said contracts to his personal friends without consideration of the cost which it will entail upon the State of Missouri and the taxpayers thereof. Against which unlawful act of the defendant petitioners have no adequate remedy at law.

"Wherefore, the premises considered, the plaintiffs pray that the defendant Charles U. Becker be enjoined and restrained from arbitrarily awarding said contract at the maximum rate prescribed by the statutes until the further order of this court, and that the defendant Charles U. Becker be ordered and directed to let said contracts to the lowest and most advantageous bidder until the further order of the court, and that upon final hearing that the defendant, Charles U. Becker, be by the mandatory order of this court directed and enjoined to award said contracts for publication of the constitutional amendments to be submitted to the vote of the people at the November election, 1928, to the lowest and most advantageous terms that can be obtained from the newspapers throughout the State of Missouri, and that he be enjoined and restrained from letting any contract for the publication of said constitutional amendments proposed by the General Assembly and to be voted upon at the coming November election without having first procured the most advantageous terms which can be obtained as provided for in Section 10402, Revised Statutes 1919, not exceeding however the prescribed rate as provided in Section 10401, Revised Statutes 1919, and for all proper relief in the premises."

The findings and judgment of the respondent in case No. 5845 in his court (case No. 29178 here) were as follows:

"In this case the plaintiffs seek to restrain the Secretary of State from designating a newspaper in each county of the State and the city of St. Louis to publish the Constitutional Amendments that have been submitted to the people, either by the Initiative or by the joint resolution of the House and Senate, until he has submitted the proposition to competitive bidding.

"The position of the Secretary of State, as gathered from the testimony and the answer filed in the case, is as follows:

"That it is the duty of the Secretary of State to designate the paper in each county of the State and the city of St. Louis to publish the Constitutional Amendments, and to certify to those papers the amendments to be published, without asking for competitive bids.

"It is also the position of the Secretary of State, as stated by him in his testimony, that in his opinion the law fixes the rate for such

printing at one dollar per square for the first publication and fifty cents for each subsequent insertion and that it is not his duty to obtain better prices, and that he has no right to contract for more or less than one dollar per square for the first insertion and fifty cents for each subsequent insertion.

"It is also the position of the Secretary of State that in his dealings with the newspapers as required by law, he does not create any obligation on the part of the State, and that his sole duty is to designate the paper that is to publish the amendments at the maximum price mentioned in the statutes.

"It is the opinion of the court that it is the duty of the Secretary of State to designate a paper in each county and the city of St. Louis to publish the Constitutional Amendments, and that he is not required to submit the same to competitive bids.

"It is further the opinion of the court that it is the duty of the Secretary of State, under the law to obtain the most advantageous terms possible, which in the opinion of the court means not only the questions of the number of readers of the newspaper or its circulation in its community, but also the price the State is to pay for the publication and it is the opinion of the court that the law only fixes a maximum amount and that the Secretary of State should ascertain the rate charged by the newspaper in which the amendments are to be published and to obtain from them their rate on legal publications and the Secretary of State should not contract for a rate or designate a newspaper which would be in excess of what is reasonable in the locality of the newspaper publishing the amendment and, of course, not in excess of the price as fixed in the statutes.

"It is the court's further opinion that it is the duty of the Secretary of State to ascertain these prices prior to the time he designates the newspaper which is to publish the amendments, and if they submit prices which are unreasonable and in excess of the price charged by such newspaper for other legal publications, that then it becomes the duty of the Secretary of State to seek other newspapers that will be willing to publish the amendments at a reasonable price.

"It is the opinion of the court that the law lodges with the Secretary of State some discretion when the law states he must obtain the most advantageous terms in designating a newspaper to publish these amendments and that he must exercise that discretion and select those papers that give the widest publicity at rates which are reasonable; and in exercising this discretion he must protect the interest of the State financially as well as otherwise.

"It is further the opinion of the court that the Secretary of State does create an obligation on the part of the State when he selects and designates a newspaper in each county to publish these amendments.

"It is therefore ordered by the court that the Secretary of State designate a newspaper in each county of the State and the city of St. Louis and to certify to them all constitutional amendments to be voted on at the coming election, after first having obtained from said newspaper the prices they are to charge for. such publications, which prices should not be unreasonable or in excess of the ordinary prices charged by said papers for legal publications in their community.

"It is further ordered by the court that after having designated a newspaper in each county and the city of St. Louis, that the Secretary of State have said amendments published as required by law."

We further quote from relator's petition for our writ, as follows:

"Relator further states and shows to the court that the election at which said proposed amendments to the Constitution of this State shall be submitted to the voters for their approval or rejection, will be held on the 6th day of November, 1928, and that the publication of said proposed amendments in the aforesaid newspapers should be inserted for four consecutive weeks next preceding said election.

"Relator further states and shows that even if the said Charles U. Becker, Secretary of State of the State of Missouri, and defendant in said action in the Circuit Court of Cole County, Missouri, should apply for and be granted an appeal herein, such appeal would be returnable to the Supreme Court at the April term, 1929, and the. cause could not be determined thereby until long after the time for the publication of said proposals had expired.

"Relator further states and shows that great public interests are involved and that the rights of the people of the State of Missouri to propose said amendment to the Constitution and the right and authority of the General Assembly of the State of Missouri to propose said amendment to the Constitution, and the means and methods provided by law for publishing and presenting such proposals to the people of the State of Missouri for their rejection or approval, will be denied, destroyed and nullified and the publication of such proposals be prevented unless the questions involved in said cause, proceeding and judgment in the Circuit Court of Cole County, Missouri, be speedily reviewed, corrected and determined by this court.

"Relator further states and shows that the finding, decision and decree of the respondent herein so made and entered in said cause in. the Circuit Court of Cole County, Missouri, is in excess of and beyond the jurisdiction, authority and power of said court and not authorized by law, and that the respondent herein unlawfully restrained said Secretary of State from exercising his discretion as an officer of the State and from performing the duties devolving upon him in his official capacity.

"Relator further states and shows that the people of the State of Missouri whose rights are primarily affected and on whose behalf this action is now brought and who have the right to have said proposed amendments published and to be thus advised of their purpose, terms and provisions, have no adequate remedy at law or otherwise than by this Honorable Court's writ of certiorari.

"Wherefore, relator prays this honorable court to issue its writ of certiorari herein, directed to the respondent, Henry J. Westhues, in his official capacity as Judge of the Circuit Court of Cole County, Missouri, requiring him to forthwith certify to this court a full, true and complete copy of all the pleadings, proceedings, records, orders, judgment and decree in the aforesaid action and matter as they are of record and on file in said circuit court, in order that the Supreme Court of Missouri may pass upon the legality thereof and make such orders and judgments in the premises as may be just and proper, and in order that the judgment and decree of said circuit court may be quashed, vacated, corrected or modified wherein it may be found to be erroneous or unauthorized or in excess of the jurisdiction of said court, and for all other further and proper relief."

A stipulation has been filed in which it is admitted that an injunction bond in the sum of $200 was given in the circuit court. We quote from the stipulation, as follows:

"It is further agreed that the plaintiffs were and are taxpaying citizens of the State of Missouri, and that the defendant (Becker) at the time of the filing of the petition in the Circuit Court of Cole County, Missouri, and the issuance of the temporary restraining order and the trial of the case, was about to designate a newspaper in each county of the State and in the city of St. Louis in which the proposed amendments to the Constitution should be published, and to certify the same for publication in full therein without taking or receiving competitive bids for such publications or taking or receiving statements from the publishers of such newspapers as to the price to be charged and paid therefor, and would have so published the same had he not been enjoined."

Relator has filed his motion for judgment on the pleadings and stipulations in case No. 29178.

II. We quote from relator's petition in case No. 29179, as follows:

"Relator further states and shows that on the —— day of May, 1928, there was filed in the office of the Secretary of State of the State of Missouri a petition duly signed by more than eight per cent of the qualified voters in each of more than two-thirds of the Congressional districts of the State of Missouri, proposing the enactment of a law relating to pensions for policemen of certain cities,

such proposal to be submitted to the qualified voters of the State for adoption or rejection at the general election to be held in this State on the first Tuesday after the first Monday in November in the year 1928.

"Relator further states that it became and was and now is the duty of said Charles U. Becker as Secretary of State of the State of Missouri to cause proposals for the amendment of the Constitution of this State and the enactment of laws by the initiative to be published according to law and to designate a newspaper in each of the several counties of the State and in the city of St. Louis in which the same should be published; that said Charles U. Becker, as said Secretary of State, was proceeding to execute and perform the duties thus devolving upon him on the 6th day of August, 1928, on which date there was filed in the Circuit Court of Cole County, Missouri, and before Honorable Henry J. Westhues as judge thereof, a petition for injunction to restrain said Secretary of State from publishing said proposed law, in which John Fugel, . . . et al., are plaintiffs, and Charles U. Becker, Secretary of State of the State of Missouri, is defendant."

It is then alleged that respondent issued a temporary injunction against the Secretary of State and, after certain proceedings, made such injunction permanent and refused to set the same aside.

The facts in this case (No. 29179) need not be set out in such detail, as we did in case No. 29178. They proceed along the same general lines. The theory of the petition filed in the circuit court case (No. 5844 there) was that the Secretary of State has no authority whatever to publish in a newspaper in each county in the State the full text of initiative measures proposing the enactment of a statute or of measures referred to the people under the referendum and that the only authorized means for informing the voters of the nature of initiative and referendum measures as to proposed statutes is the ballot title provided for by Section 5910, Revised Statutes 1919.

The petition in the circuit court proceeded along the same general lines as the petition we have quoted from at considerable length in stating the facts in case No. 29178. It is alleged therein that the Secretary of State is about to enter into contracts on behalf of the State with a newspaper in each county for publishing the full text of initiative measures at an expense to the State of more than $75,000; that Mr. Becker, as Secretary of State, has made publication of initiative and referendum measures in the past at a cost of more than $450,000, etc.

The prayer of the petition in the circuit court was that relator be enjoined from entering into contracts for publication of initiative

proposals at the November, 1928, election and from creating against the State any pecuniary obligation in that behalf.

The findings and judgment of the circuit court in its case No. 5844 were as follows:

"The court is of the opinion that the Secretary of State is not authorized under the law to designate the newspaper in each county to publish the initiative and referendum petitions which are not Constitutional Amendments.

"THEREFORE, Proposition No. Two, which is an Initiative Petition, seeking to enact a law for the pensioning of police in certain cities is not a law which the Secretary of State is authorized to publish.

"THEREFORE, The Injunction will be made permanent, restraining him from designating a newspaper in each county of the State and the city of St. Louis for the publication of the Initiative Petition."

In his petition in this case, relator follows the same general allegations quoted by us so fully in stating the facts in case No. 29178. In brief, he alleged that the judgment of respondent was wholly unauthorized and alleged facts tending to show the inadequacy of the remedy by appeal, which would justify the issuance of our writ of certiorari. The prayer was that the judgment entered by respondent be quashed.

A stipulation was also filed admitting that an injunction bond in the sum of $200 was given in the circuit court. It is further stipulated therein "that the plaintiffs were and are taxpaying citizens of the State of Missouri, and that the defendant (Becker) at the time of the filing of the petition in the Circuit Court of Cole County, Missouri, and the issuance of the temporary restraining order and the trial of the case, was about to designate a newspaper in each county of the State and in the city of St. Louis in which the proposed law should be published, and to certify the same for publication in full therein without taking or receiving competitive bids for such publication, and taking or receiving statements from the publishers of such newspapers as to the price to be charged and paid therefor, and would have so published the same had he not been enjoined."

Relator has also filed his motion for judgment on the pleadings and stipulations in this case (No. 29179).

III. Before undertaking a consideration of the two cases upon their merits, it is necessary to determine whether certiorari may be

employed to bring before this court the judgments and proceedings lately pending before the Cole County Circuit Court. It is conceded that the general rule is that certiorari will not lie to review the judgment of an inferior court if review by appeal or writ of error furnishes an adequate remedy. [11 C. J. 103, sec. 29; 11 C. J. 113, sec. 57.]

There can be no doubt that the Secretary of State could review the action of the Cole County Circuit Court upon appeal or writ of error. But the fact that appeal or writ of error will lie is not sufficient to bar certiorari, unless such remedy by appeal or writ of error is adequate. [11 C. J. 116, sec. 58; 5 R. C. L. 257, sec. 8; State ex rel. Hamilton v. Guinotte, 156 Mo. 513, 57 S. W. 281.] In the Guinotte case, it was said:

"But the statement that certiorari will not issue where either appeal or error goes, though frequently met with in text-writers, and in some reports, is neither strictly true nor accurate; there are marked exceptions. Thus where the exigencies of the case are such that the ordinary methods of appeal or error may not prove adequate either in point of promptness or completeness so that a partial or total failure of justice may result, then certiorari may issue. [Harris, Certiorari, sec. 54.] The rule that appeal or writ of error existing, bars certiorari, is subject to the qualification that such other means of redress, in order to form a bar, should be adequate to meet the necessities of the case. Thus the right of appeal, while generally held an adequate means of correcting mere errors committed in the exercise of jurisdiction, may prove inadequate to redress or prevent a wrong done in the absence or excess of jurisdiction. [Citing cases.]

"In this regard, certiorari accomplishes in effect the same functions as does a court of equity where it interposes because the remedy at law is neither adequate, certain nor complete. By it if the inferior court is guilty of proceeding in the absence or excess or usurpation of jurisdiction, then that court may be kept within proper bounds. [State ex rel. v. Dobson, 135 Mo. l. c. 19, and cases cited.] And certiorari is a summary and more effective remedy for judicial excesses than writ of error or appeal. [2 Spelling, Extr. Relf., sec. 1890.]

"There are many authorities which hold that it is the inadequacy, and not the mere absence of all other legal remedies, and the danger of a failure of justice without it, that must usually determine the propriety of this writ. [Citing cases.]

"An adequate remedy is a remedy which is equally beneficial, speedy and sufficient, not merely a remedy which at some time in the future will bring about a revival (reversal) of the judgment of

the lower court complained of in the certiorari proceeding, but a remedy which will promptly relieve the petitioner from the injurious effects of that judgment and the acts of the inferior court or tribunal.'' [Citing cases.] (Correction in parentheses ours.)

The facts that the election, at which the foregoing propositions are to be voted upon, occurs on the 6th day of the. coming November and that the return term for an appeal or a writ of error would not be held until long after that date, necessarily require the conclusion that an appeal or writ of error by the Secretary of State would in neither case afford an adequate remedy. Disposition of such appeal or writ of error would be too late and utterly ineffective to correct the injury done by the judgment of respondent alleged by relator to be erroneous and to have been entered in excess of respondent's jurisdiction as judge of the circuit court. Such considerations bring these cases within the exception to the general rule and demonstrate clearly that certiorari is the proper and appropriate remedy.

The right of the Attorney-General, in the name and on behalf of the people of the State, to attack said judgments by certiorari has not here been challenged. The Attorney-General is the legal representative of the people of the State and as such is entitled to represent the public in all matters in which said public has an interest. It requires no argument to demonstrate that the issues here involved are of great public interest and concern. The public was a party to this case in the circuit court in substance, though not in form. Its interests were vitally affected.

It has the right to appear in this court and ask relief against the judgment of the circuit court by certiorari. Such is the general rule. [11 C. J. 134, sec. 97; 5 R. C. L. p. 255, sec. 7.]

IV.  We will first consider whether respondent had the authority to enjoin the Secretary of State from publishing in a newspaper in each county of the State the full text of the initiative proposal for the enactment of the statute referred to in the petition. It is admitted that Mr. Becker, as Secretary of State, was about to do this and would have done so had he not been enjoined from so doing.

The initiative-and-referendum amendment to our State Constitution was adopted at the general election held November 3, 1908. · It now appears as Section 57, Article IV, of the Constitution. It is unnecessary to lengthen this opinion further by quoting the amendment in full. It provides for the enactment of laws by the people independent of the legislative assembly by a vote upon measures submitted to them by initiative petitions and for the rejection of laws enacted by the General Assembly by a vote of the people upon

referendum petitions. It also provides for amendment of. the Constitution by use of the initiative. The only part of the amendment which need be quoted here is the last sentence, reading as follows:

"Petitions and orders for the initiative and for the referendum shall be filed with the Secretary of State, and in submitting the same to the people he, and all other officers, shall be guided by the general laws and the act submitting this amendment, until legislation shall be especially provided therefor."

When the initiative-and-referendum amendment to the Constitution was submitted to the people and when it was adopted, the only legislative proposals submissible to the people for approval or rejection were.amendments to the Constitution proposed by the General Assembly. Hence, the only general laws then in force governing submission of such proposals to the people were the constitutional provisions and statutes in respect to the submission of proposed constitutional amendments.

Section 2, Article XV, of the Constitution provides for its amendment by submission to and adoption by the people of proposals of the General Assembly. Said section provides that "the proposed amendments shall be published with the laws of that session, and also shall be published weekly in some newspaper, if such there be, within each county in the State, for four consecutive weeks next preceding the general election then next ensuing." Clearly there must be a publication in each county of the full text of constitutional amendments.

Under authority of Section 2, Article XV, the General Assembly enacted what are now Sections 4941 and 4942, Revised Statutes 1919. The first portion of Section 4941 is practically in the language we have quoted above from Section 2, Article XV, of the Constitution. It provides in addition for the posting of copies of proposed constitutional amendments at each voting place upon the day of election for the information of voters. Section 4942 provides for designation by the Secretary of State of the newspaper in each county in which the proposed constitutional amendments shall be published and also provides the manner of paying for such publication.

The foregoing constitutional and statutory provisions were the only general laws in force, when the initiative-and-referendum amendment was adopted, which could have any bearing upon the question of whether or not initiative and referendum measures were required to be published in full in a newspaper in each county. As legislative proposals for amending the Constitution were then required to be published in a newspaper in each county, it seems clear that in submitting initiative and referendum measures the Secretary of State was required, at that time at least, to make publication thereof in like manner.

V. As Section 57, Article IV, of the Constitution, authorizes legislation to provide for the submission of initiative and referendum proposals, it next becomes necessary to determine whether the General Assembly has undertaken to do away with the requirement of publication in full of such proposals in a newspaper in each county. Respondent so held.

In 1909 the General Assembly enacted what is now Chapter 47 of the 1919 Statutes. That part of Section 5910 of said chapter, which bears upon the manner of submitting initiative and referendum measures and which is relied upon by respondent as a full, proper and exclusive legislative provision for submitting such measures, and as legislation ''especially provided therefor,'' is as follows:

''When any measure shall be filed with the Secretary of State, to be referred to the people thereof by the referendum petition, and when any measure shall be proposed by the initiative petition, the Secretary of State shall forthwith transmit to the Attorney-General of the State a copy thereof, and within ten days thereafter the Attorney-General shall provide and return to the Secretary of State a ballot title for said measure. The ballot title may be distinct from the legislative title of the measure, and shall express, in not exceeding one hundred words, the purpose of the measure. The ballot title shall be printed with the number of the measure on the official ballot. In making such ballot title the Attorney-General shall, to the best of his ability, give a true and impartial statement of the purpose of the measure, and in such language that the ballot title shall not be intentionally an argument likely to create prejudice either for or against the measure.''

Manifestly, it would be impracticable to print upon the ballots used by the voters at the election the full text of lengthy initiative and referendum measures. The Workmen's Compensation Law, enacted by the Fifty-third General Assembly and approved by the people as a referendum measure at the November, 1926, election, fills more than thirty pages as it is printed in the 1927 Session Acts. The necessity for some ballot title for such measures, in order to give information of the character and purpose of the measure to those voters who have not read the full text and as a ready and accurate means of identifying the particular proposal in the minds of those voters who have read the full text, would readily occur to the General Assembly. That is just what it seems to have undertaken to do by the language we have quoted from Section 5910. It undertook to do nothing more than to provide for an official ballot title.

The requirement of a ballot title is in no way inconsistent with and merely supplements the requirement that such proposed measures should be published in full in a newspaper in each county. The

provision for a "ballot title" does not relieve the Secretary of State of the duty, in submitting initiative and referendum measures, to be guided by the general laws in force when the amendment was adopted. The requirement of publication was not rendered unnecessary nor made unlawful by an act of the General Assembly which, on its face, did not purport to make a different and certainly not an adequate provision for advising the voters of the nature and purpose of the proposed measure. Had the General Assembly provided that the voters should be advised of the nature of the proposal, for example, by posting a true copy thereof on the front door of the court house in each county or in some public place in each voting precinct, it might then reasonably be contended that the General Assembly had undertaken to provide for a manner of publishing such proposals different from that provided for publishing constitutional amendments proposed by the General Assembly. By merely requiring a ballot title, Section 5910, Revised Statutes 1919, purports to provide neither an especial nor an exclusive method of submission. If it did, such requirement would be of doubtful constitutional validity, to say the least, because the Legislature has no power to enact a provision in conflict with a constitutional provision or a requirement clearly implied therefrom. [State ex rel. Elsas v. Workmen's Compensation Commission (Mo. Sup.), 2 S. W. (2d) 796, l. c. 801.]

As general laws, in force when Section 57, Article IV, was adopted, provided for publication of proposals to amend the Constitution in a newspaper in each county, such requirement by express reference became applicable to the submission of initiative and referendum measures and they too were required to be published in a newspaper in each county, and such requirement is still in force and effect.

VI. We will next consider whether the Circuit Court of Cole County had authority to enjoin the Secretary of State from letting contracts for publishing proposed constitutional amendments without out observing the requirements specified in its judgment. Respondent held that publication in each county in the State of constitutional amendments, whether proposed by the General Assembly or by initiative petitions, was required, and that the Secretary of State was under no legal duty to take competitive bids for such publication or to accept the lowest bid therefor. Such finding obviates the necessity of considering some of the contentions of plaintiffs in the circuit court. However, respondent held that it was the duty of the Secretary of State under the law (Sec. 10402, R. S. 1919) "to obtain the most advantageous terms possible." Respondent

then set forth what he considered is meant by the words "most advantageous terms."

It is the contention of relator that Section 10402, Revised Statutes 1919, was impliedly repealed by Laws of 1923, pages 322 and 323, whereby Section 10401, Revised Statutes 1919, was expressly repealed and new Section 10401 was enacted in lieu thereof. In this contention we are unable to concur.

. The first eleven lines of new Section 10401 are substantially the same as Section 10401, Revised Statutes 1919, except that "constitutional amendments or other questions to be submitted to the people" are added. The following language is identical in both sections, to-wit: "There shall not be allowed for such publication a higher rate than one dollar per square of two hundred and fifty ems for the first insertion, and fifty cents for each subsequent insertion; and for fractional squares and parts of squares in the same proportion."

New Section 10401 concludes as follows: "When any law, proclamation, advertisement, nominations to office, proposed constitutional amendments, or other questions to be submitted to the people, order or notice, shall be required by law to be published in any newspaper, the rates herein specified shall prevail, and all laws or parts of laws in conflict herewith, except Sections 10405, 10406 and 10407, Revised Statutes of Missouri, 1919, are hereby repealed."

"The rates herein specified" are the rates specified in the first sentence comprising eleven lines of new Section 10401. Such rates may not be higher than one dollar, etc. We are unable to perceive any conflict between new Section 10401 and Section 10402, Revised Statutes 1919. Hence, the latter section must be deemed to be in full force and effect. New Section 10401 and Section 10402, Revised Statutes 1919, must be read together and construed as if they read: There shall not be allowed for such publication a higher rate than one dollar per square, etc., but in procuring such publication, the public officers shall accept of the most advantageous terms that can be obtained, not exceeding one dollar per square, etc.

VII. . The requirement of Section 10402, Revised Statutes 1919, that the officer "shall accept the most advantageous terms that can be obtained" imposes upon such officer the right and duty to exercise an official discretion. Respondent held that the Secretary of State was under no duty to submit the publication of the proposed constitutional amendments to competitive bidding or even to accept the lowest bid, if any such bids were received. The statute does not define the words "most advantageous terms." It left it to the Secretary of State to determine for himself what terms are most advantageous and to accept the

terms he deems to be most advantageous. The statute has not provided that the advantageousness of the terms offered to the officer shall be determined by the number of readers of the given newspaper, nor by its circulation in a particular county, nor by the price to be charged for the publication, nor by the relation of that price to the maximum price authorized by new Section 10401; nor does Section 10402, Revised Statutes 1919, provide at what time the Secretary of State shall determine the advantageousness of the terms offered to him, nor even that the Secretary of State shall peddle the publication from one newspaper office in the county to another in order to ascertain all or any of these facts. In short, the General Assembly has not defined the words "most advantageous terms."

Respondent held that the Secretary of State had a discretion, which it was his right and duty to exercise. Respondent then proceeded to advise the Secretary of State how he should exercise such discretion, to-wit: "That he must exercise that discretion and select those papers that give the widest publicity at rates which are reasonable and in exercising this discretion he must protect the interests of the state financially, as well as otherwise." It may be that the Secretary of State should take all the things specified by respondent into consideration in exercising his official discretion, but the declaration of his duty in that respect must come from the legislative and not the judicial department of our state government.

The legislative department has intrusted to an administrative officer the right and duty to exercise his discretion in determining what terms are "most advantageous" and up to this time the General Assembly has seen fit neither to define what it means by the words "most advantageous terms" nor to rebuke any secretary of state for the manner in which he has exercised such discretion in the past. Reference need only be made to the Session Acts of Missouri from the date of the adoption of the initiative and referendum amendment to the present time to learn that the General Assembly has placed the seal of its approval upon the manner of the exercise of such discretion by all of our secretaries of state when it uniformly passed appropriations to pay for such publications on the terms accepted by them. The appropriation for that purpose by the General Assembly in 1927 is particularly significant (Laws 1927, p. 69, sec. 80), in view of the fact that the Secretary of State was at that time enjoined from approving bills for such publications. [See Fugel v. Becker (Mo. Sup.), 2 S. W. (2d) 743.]

The general rule is thus stated in 32 Corpus Juris at page 242:

"Where public officials are intrusted with discretionary power in certain matters, their exercise of such discretion will not be controlled by injunction in the absence of any showing that their action is fraudulent or in bad faith, or that it amounts to an abuse of the

discretion so vested in them; and this is so although the powers vested in such officers are quasi-judicial as well as administrative; and especially is this true where the restraining of the officer's action would impose a large additional expense on the public. Courts will not hear proofs and attempt to determine whether the discretion is wisely exercised or not. Where the law casts both a right and a duty upon an officer which involves exercise of discretion, the officer's conduct with respect to his duty or discretion is no more to be controlled by injunction than by mandamus. Interference in such a case would be to interfere with the ordinary functions of government. Courts cannot legislate or invade the province of the other departments of government in matters of policy. However, the general rule has no application where there has been fraud or collusion on the part of the public officer in the performance of his duty, and an injunction may be issued in case of a gross abuse of discretion, but to constitute an abuse of such discretion it must appear that it was exercised on grounds or for reasons clearly untenable, or to an extent clearly unreasonable." [See, also, Kearney v. Laird, 164 Mo. App. 406, 144 S. W. 904.]

Article III of our Constitution provides that:

"The powers of government shall be divided into three distinct departments—the legislative, executive and judicial—each of which shall be confided to a separate magistracy, and no person, or collection of persons, charged with the exercise of powers properly belonging to one of those departments, shall exercise any power properly belonging to either of the others, except in the instances in this Constitution expressly directed or permitted."

It cannot be said on this record that the acts and conduct of the Secretary of State in proposing (as it is stipulated) "to designate a newspaper in each county of the State and in the City of St. Louis in which the proposed amendments to the Constitution should be published . . . without taking or receiving competitive bids for such publications or taking or receiving statements from the publishers of such newspapers as to the price to be charged and paid therefor" amount to such fraudulent conduct and abuse of official discretion as to give to the courts the right to control the discretion of the Secretary of State. The only facts before us are the stipulated facts just referred to. The Secretary of State may have determined from sources other than statements of the publishers of newspapers facts which influenced his official discretion in accepting as most advantageous the terms of such newspapers for publishing the proposed constitutional amendments.

Respondent did not find that the Secretary of State was about to exercise his discretion fraudulently, so that no discretion would, in fact, be exercised by him, but quite obviously undertook to substitute his judgment for that of the Secretary of State as to what considerations should control that officer in the exercise of his official discretion. This the trial court had no power to do. The Secretary of State is an officer of a department of the state government, separate and distinct from the judicial department. In the absence of fraud, the exercise of his official discretion cannot be controlled by the judicial department. The legislative department may lay down rules for the guidance of the Secretary of State in the performance of this duty, if so advised. Certain it is that the Circuit Court of Cole County had no power to interfere in the exercise of the discretion intrusted to the Secretary of State upon the facts contained in the record before us, which record is stipulated here as the record before respondent when he entered the judgments complained of.

It follows that relator's motions for judgments on the pleadings and stipulations in both cases should be sustained and that the records before us in those cases should be quashed. It is so ordered. All concur, except *Gentry* and *Walker, JJ.*, not sitting.