STATE OF MISSOURI, at the relation of GILBERT G. ARMONTROUT, Relator, v. FORREST SMITH, State Auditor of the State of Missouri.—No. 39201.—182 S. W. (2d) 571.

Court en Banc, October 13, 1944.

*George A. Spencer* for relator.

*Roy McKittrick*, Attorney General, *B. Richards Creech* and *Ralph D. Lashly*, Assistant Attorneys General, for respondent.

488

HYDE, J.—This is an original proceeding in mandamus to compel the State Auditor to approve relator's claim and issue a warrant therefor. The question involved is the validity of a deficiency appropriation.

The parties have filed an agreed statement of facts. The Sixty-first General Assembly appropriated $25,000.00 for the 1941-1942 biennium to pay indemnities to owners of cattle, slaughtered as reactors to Bang's disease (contagious abortion), to cooperate with the program of the United States Department of Agriculture for controlling this disease. Relator, a farmer, in April, 1942 disinfected his premises as instructed by inspectors and in September and October, 1942 had blood tests of his cattle taken by them. Three cows reacted to the tests and were appraised, shipped to market and slaughtered at a loss of more than $25.00 each. Relator's claim for $24.99 ($8.33 each), for this state's share of the indemnity due him, was approved by the State Veterinarian, by the Commissioner of Agriculture and by the Governor. However, the $25,000.00 appropriation had been expended to pay prior claims before relator's claim came into existence. Thereafter, in 1943, the Sixty-second General Assembly appropriated $32,-323.80 "for indemnity and relief of persons, firms and corporations, for their cattle condemned and slaughtered as reactors of the agglutination blood test for Bang's disease and in cooperation with the United States department of Agriculture for the period from January 1, 1941 to December 31, 1942, as per accounts now on file in the office of the State Auditor". This disease is not only disastrous to cattle owners, but the use of milk from cows infected with it is believed to be the cause of undulant fever in human beings. The 1939 Act for control of Bang's disease was enacted with an emergency clause, reciting that it was "required for the preservation of the public health, safety and general welfare." (Laws 1939, p. 240.) A deficiency appropriation of $50,793.06 was made in 1941 (Laws 1941, p. 252) to pay claims for cattle slaughtered under this program between June 15, 1939 and December 31, 1940.

The validity of this appropriation being questioned, it was approved by the Governor upon the assurance of the State Auditor that no warrant would be issued for such claims unless "it shall have been adjudged by the Supreme Court of Missouri that such warrant should be issued". The Attorney General contends that the General

Assembly did not have the authority to make this appropriation because of the limitation of its powers stated in the second clause of Sec. 48, Art. IV of our Constitution, as follows: "The General Assembly shall have no power to . . . authorize the payment of any claim hereafter created against the State, or any county or municipality of the State, under any agreement or contract made without express authority of law; and all such unauthorized agreements or contracts shall be null and void."

It is argued that relator's claims are based on contracts or agreements within the meaning of this Constitutional provision; that they were unauthorized because Sec. 10907 (this and all other references are to Mo. R. S. Ann. and R. S. 1939), a part of the Budget Act, provides: "No expenditure shall be made and no obligation incurred by any department without the certification of the auditor that there is a sufficient unencumbered balance in the allotment and a sufficient unencumbered cash balance in the treasury to the credit of the fund from which such expenditure or obligation is to be paid, each sufficient to pay the same"; and that this is recognized in Sec. 14209 (authorizing Bang's disease control) by the following limitation therein: "Within the amounts, which may be appropriated for this purpose, the State may pay such proportion of the indemnity and of the expenses incurred in suppressing or combating such disease under the provisions of this section as shall be determined by and mutually agreed upon with the United States Department of Agriculture, provided, however, that such amounts paid for indemnity on each individual animal by the state shall not exceed the amount paid by the United States."

■ Participation in this program is purely voluntary on the part of the farmer. He must request the inspection and is not compelled to accept the appraisement after it is made. There is nothing in any of the papers signed to prevent his withdrawal from further participation in the program at any time. Nevertheless, he does accept the result when he ships his cattle for slaughter. Therefore, the arrangement made between relator, with representatives ■ of this state and the United States Department of Agriculture, for shipment and slaughter of his cattle, may properly be considered as an agreement or contract within the meaning of Sec. 48, Art. IV, but we do not see how it can reasonably be said to be lacking express authority of law. Sec. 14211 specifically provides such express authority as follows: "The Commissioner of Agriculture is hereby authorized to enter into an agreement with the cooperating agencies of the United States Department of Agriculture for a joint agreement with the owner of cattle to be tested for Bang's disease, said agreement setting forth the respective undertakings of (1) the State (2) the United States and (3) the owner": Secs. 14210 and 14212 set out in detail the methods to be followed, and the conditions to be complied with to obtain

the indemnity to be paid by the state, which of course would become a part of any agreement made under this Act. (Forms of the U. S. Department of Agriculture were used in this case, and there is no contention that they fail to comply with these statutes.) Furthermore Sec. 12410 specifically provides that the amount certified by the State Veterinarian to the Governor, as this state's share of the indemnity, in any case, *"shall constitute a legal claim against the state."* In State ex rel. Kelly v. Hackmann, 275 Mo. 636, 205 S. W. 161, this court held a contract of the Board of Fund Commissioners for a plan for selling bonds to be valid (and not made without express authority of law) under Sec. 48, when such authority was essential to carry out the powers, which the statute gave them, to make contracts and to sell bonds, and therefore must be considered as a part of the powers granted. (See also State ex rel. Meals v. Hackmann (Mo. Sup.), 217 S. W. 271.) Certainly the provisions of Sec. 14211 are much more definite and it is difficult to see how specific authority to make such agreements could be more expressly given.

Respondent relies on Sager v. State Highway Commission, 349 Mo. 341, 160 S. W. (2d) 757; and Spitcaufsky v. State Highway Commission, 349 Mo. 117, 159 S. W. (2d) 647. In these cases, we held that alleged oral agreements concerning state highway work were unenforceable, under Sec. 48, because they were in violation of Sec. 8764 providing requirements for such contracts. However, the alleged contracts, sought to be enforced in those cases, were in direct violation of the statutory requirements. We have exactly the opposite situation presented here.

As for the phrase, in the last sentence of Sec. 14209, ("within the amounts which may be appropriated"), this sentence apparently refers to arrangements to be made between this state and the United States Department of Agriculture, rather than to agreements to be made with farmers. It relates to the portion of the indemnity to be paid by this state to "be determined by and mutually agreed upon with the United States Department of Agriculture" and fixes the maximum which "shall not exceed the amount to be paid by the United States". Therefore, its reasonable construction would seem to be that it is a limitation upon what is to be paid by this state on agreements to be made with farmers and not upon the authority to make them. Of course, nothing can ever be paid, on any claim against the state, until there is an appropriation. But valid agreements may nevertheless be made, before an appropriation is made to pay what is due thereunder, if there is express authority of law for making them. This is recognized by the very language of Sec. 48, which only prohibits an appropriation to pay a claim based on an agreement made without express authority of law. Thus this language assumes that appropriations to pay claims based on agreements made with express authority of law are not prohibited and would be valid.

There must necessarily be some such claims in our state government. For example, Secs. 11677-11678 authorize the Secretary of State to designate newspapers in each county to publish constitutional amendments and initiative proposals (State ex rel. Shartel v. Westhues, 320 Mo. 1093, 9 S. W. (2d) 612) and to certify their claims for publication to the State Auditor. Designated newspapers, of course, must accept this designation and agree to make the publication. There are always deficiency appropriations to pay these claims. (Laws 1943, p. 141; Laws 1941, p. 130; Laws 1939, p. 35; Laws 1937, p. 147.) They could not well be otherwise handled because no legislature could estimate in advance the number and length or cost of such proposals, if any, more than a year in advance of the election at which they would have to be submitted. (See also State ex rel. Averill v. Smith (Mo. Sup.), 175 S. W. (2d) 831.) Likewise, the number of cattle which would be found infected with Bang's disease, during any biennium, could not well be estimated two years in advance with reasonable accuracy; nor the appraisement of each and the loss thereon when sold. It would not be reasonable to say that the Legislature meant to authorize this state to go into the continuous long time program of the United States Government to stamp out this disease, and then stop after a few months if the appraised losses exhausted the initial appropriation for the biennium; thereby allowing the disease to spread again, for a year or more, before doing anything more about it. The broad authority stated in Sec. 14211 was no doubt given for the specific purpose of authorizing continuous participation in the program, for control of this disease, by granting express authority of law to make agreements therefor which would "constitute a legal claim against the state" and authorize a valid subsequent appropriation under Sec. 48.

██ For these reasons also, Sec. 10907 of the Budget Law cannot be construed as making invalid, contracts or agreements for which express authority of law is given specifically by other later statutes. Respondent cites White v. Jones (Mo. Sup.), 177 S. W. (2d) 602; but we there held that "while Section 14590, supra, expressly authorizes the state purchasing agent to negotiate leases, there is no express authorization for him to incur obligations for rentals or otherwise that will fall due and become payable after the lapse of two years from the date of the passage of the appropriation out of which said indebtedness is to be paid". However, as shown in White v. Jones, supra, (177 S. W. (2d) 603, 1. c. 606) officers of eleemosynary institutions, therein involved, are specifically forbidden by Sec. 9265, to contract "any debt for which there shall not be at the time an adequate appropriation." The difference here is that Sec. 14211 does expressly authorize these agreements with farmers by this state in cooperation with the United States Department of Agriculture and there is no such limitation involved. The State Purchasing Agent

Act (Sec's. 14590, 14592) also requires purchases of supplies (as well as leases) for all departments to be made through the purchasing agent. It further requires the purchasing agent to have "a certification from the auditor that an unencumbered balance remains in the appropriation and allotment to which the same is to be charged and that an unencumbered balance remains in the fund from which payment is to be made, each sufficient to pay therefor" before furnishing supplies to any department. Likewise Sec's. 14975-14999 require that printing must be contracted for through the Printing Commission. (See State ex rel. McKinley Publishing Co. v. Hackmann, 314 Mo. 33, 282 S. W. 1007.) (See also specific provisions of County Budget Law as to making contracts, Sec. 10932.) All of these acts, the Budget Act, the Purchasing Agent Act and the County Budget Act were passed at the same session in 1933. Their primary purpose was to regulate the usual operation of the regular departments of Government whose needs could be foreseen and planned on a biennial basis. It is significant that there are no such limitations in the Act of 1939 authorizing these joint agreements for the control of Bang's disease. The omission of such limitations is especially significant because this act was passed six years after the enactment of the Budget Act and the Purchasing Agent Act; and after their operation was well known and well established. The settled rule, of course, is that in case of inconsistency the later act controls (50 Am. Jur. 357, Sec. 355.) We, therefore, hold that the agreement upon which the claim herein involved is based, was made with express authority of law and is valid; and that Sec. 48, Art. IV of the Constitution does not prohibit this appropriation.

We do not wish to weaken in any way the excellent purpose and effect of the Budget Act. We, therefore, specifically confine our ruling to such a situation, as here, where the Legislature by subsequent Act has given express authority of law to make contracts or agreements, and create legal claims, about some subject matter concerning public health, safety or welfare, as to which biennial estimates cannot reasonably be made in advance and has stated no limitation therein requiring an advance appropriation. (Of course, there are also claims specifically authorized by statute, and not arising from contract, for which there are always deficiency appropriations, such as criminal costs, apprehension of criminals, sheriffs, special judges, etc.) However, the State's finances are protected in any event by the fact that, even though the validity of any contract or claim is unquestioned, no money of the state can be paid thereon until there is an appropriation made by the Legislature to pay it. This fundamental difference between state and private contracts is pointed out in 49 Am. Jur. 275, Sec. 62, as follows: "Aside from the fact that a contract of the state must ordinarily rest upon some legislative enactment and in this respect is distinguished from contracts with individuals,

there is another essential and far-reaching difference between the contracts of citizens and those of sovereigns, not, indeed, as to the meaning and effect of the contract itself, but as to the capacity of the sovereign to defeat the enforcement of its contract. The one may defeat enforcement, but the other cannot. This result flows from the established principle that a state cannot be sued. The Legislature has the ability to avoid payment of the obligations of the state by a failure or refusal to make the necessary appropriation, although that body cannot impair the obligation of the contract, and creditors accepting obligations of the state are bound to know that they cannot enforce their claims against the state directly, nor against its officers, when no appropriation has been made for their payment. Unless there is an appropriation, courts have no power to enforce a contract of a state, even though they do not doubt its validity.'' Certainly courts should not prevent recognition by the Legislature of the valid obligations of the State.

It is, therefore, ordered that our peremptory writ of mandamus be issued. All concur.