STATE of Missouri ex rel. John J. COLE, Chairman; Robert E. Fitzgerald, Sr., Secretary; Sylvester G. Lipic and Carl V. Eimbeck, Members, All Constituting the Board of Election Commissioners of St. Louis County, Missouri, and Also as Voters and Taxpayers, St. Louis County, Missouri, Relators,

v.

Luman F. MATTHEWS, County Supervisor, St. Louis County, Missouri; Frank L. Martin, Chairman; Tom Dunne, James H. J. McNary, Eugene Buechler, James A. Singer, Harold D. Carey and L. Gordon Davis, Members, County Council, St. Louis County, Missouri; Harry Konetzky, Purchasing Agent, St. Louis County, Missouri, and Clarence Hackmann, Auditor for St. Louis County, Missouri, Respondents.

No. 44548.

Supreme Court of Missouri.

En Banc.

Dec. 13, 1954.

Rehearing Denied Jan. 10, 1955.

Robert T. Hensley, David R. Hensley, Hensley & Hensley, St. Louis, for relators.

John J. McAtee, County Counselor of St. Louis County, Clayton, C. W. Detjen, Asst. County Counselor, St. Louis, for respondents.

HOLLINGSWORTH, Judge.

Relators constitute the Board of Election Commissioners of the County of St. Louis and prosecute this action as such and also as voters and taxpayers of said county. Respondents are, respectively, the Supervisor, the members of the Council, the Purchasing Agent and the Auditor of said county. The petition seeks our writ of mandamus commanding respondents to award a contract to Shoup Voting Machine Corporation for the purchase of 400 voting machines of certain type and specifications for use in the conduct of elections in St. Louis County. Upon issuance of the alternative writ, respondents made return thereto, denying the right of relators to designate the type and number of machines to be purchased for use in said county, and asserting that the right to select and purchase voting machines was vested in them as the governing body of the county.

The petition was filed on July 15, 1954, at which time it was in good faith plausibly insisted by relators that an early decision of the issue was of great urgency and public importance in order to effect the procurement of such machines for use in the November, 1954, election. We, therefore, waived our Rule 1.23 Supreme Court Rules, 42 V.A.M.S., and assumed jurisdiction. But, due to the time required in making up the issues and in docketing the cause for argument on October 8, 1954, it became impossible to finally determine the matter in time to enable the acquisition of machines by either of the parties for use in said election. However, inasmuch as the cause has now been briefed, orally argued and submitted in this court, we will dispose of it on the merits. See Art. V, § 3, Constitution of Missouri, V.A.M.S.;

State ex rel. Board, etc., St. Louis Public Schools v. Tracy, 94 Mo. 217, 6 S.W. 709.

In 1953, Laws 1953, p. 720, §§ 121.010 to 121.270 RSMo. 1949, Cum.Supp., V.A.M.S., the Legislature enacted a voting machine law, authorizing adoption of voting machines for use in any or all precincts in which registration is required. Concededly, it is applicable to St. Louis County. In an effort to obtain the benefits of its provisions, the following steps were taken:

On February 9, 1954, pursuant to a special election held under the provisions of § 121.020, the qualified voters of St. Louis County, by a vote of more than two-thirds majority, approved the acquisition and use of voting machines and authorized the issuance of the county's bonds in the amount of $650,000 for the purchase thereof. Thereafter, relators made an extended survey and study of voting machines suitable for use in the county and, on May 8, 1954, by unanimous written report, recommended the purchase and use of machines designated as "50 row, combination electrical-manual operated machines of the vertical ballot type arrangement", certifying in said report, among other things, that such machines afforded: (1) better arrangement of the ballot and greater legibility, (2) front tabulating counters, (3) greater security features, and (4) safeguards to prevent lost votes.

On May 21, 1954, in the manner prescribed by § 50.660 of the County Budget Law and its charter and ordinances, St. Louis County advertised for bids on machines of the aforesaid type and for bids on several other types of machines. On May 28, 1954, two bids were received, one from Shoup Voting Machine Corporation and one from Automatic Voting Machine Corporation. Shoup offered 400 of its machines for a price of $645,536. Automatic offered 400 of its machines for a price of $618,800.

On June 21, 1954, relators in a letter to, respondent supervisor, requested that the Shoup offer be accepted for the purchase of "four-hundred (400) ten (10) column, fifty (50) row combination electrically and manually operated Voting machines with Front reading counters at a total price of Six-hundred forty-five thousand, five hundred and thirty six dollars ($645,536.00)", and enclosed a requisition covering such purchase. The letter also stated:

"The Board wishes to point out that while this bid is higher than that of the Automatic Voting Machine Corporation by Twenty-six thousand, seven hundred and thirty-six dollars ($26,736.00) and that seventeen (17) more machines of the Automatic Corporation could be purchased with the same amount of money, nevertheless, the Shoup Machine is more desirable and has certain advantages to the voters and to the efficient administration of elections in St. Louis County which far outweigh the difference in cost. The advantages of the Shoup machine with the vertical type ballot arrangement were fully set forth in the Board's Report, recently forwarded to you, members of the St. Louis County Council, members of the St. Louis County Citizens Public Works, Financial Advisory Committee and other interested citizens and groups. Briefly, the Election Board is of the unanimous opinion that the Shoup machine has a more legible and more easily understood ballot arrangement which would make the task of instructing the voters easier and less costly and would reduce confusion on the part of the voters on election day. The Board is convinced that the front counters on the face of the Shoup machine under each candidate's name are alone worth the difference in cost between the two (2) machines. The front counter arrangement would do more to eliminate the serious problem of tabulation errors than would the rear counter machine. Furthermore, the Board is convinced that the security features of the Shoup machine are superior to the Automatic machine and also justify the additional cost. * * *

"The Board also requests that the St. Louis County Council provide funds for the acquisition of the additional machines needed by St. Louis County, as set forth in the Board's said report. The Shoup Company will rent additional machines for One-hundred and fifty dollars ($150.00) each per year, the rental to apply on the purchase price of the machines and will also sell additional machines to St. Louis County on installment notes at a rate of interest not to exceed $2\frac{1}{4}\%$ annually. The Board requests that the purchase of the initial Four-hundred (400) machines not be delayed pending the negotiations for additional machines."

Respondents refused to honor the requisition and respondent auditor refused to certify that there were unencumbered bond funds to permit payment of the purchase of the machines specified in the requisition. On the contrary, the county council, on July 7, 1954, adopted a resolution "that the bid of the Automatic Voting Machine Corporation for 40 column manually operated voting machines be and it is hereby approved and accepted for the outright purchase of as many machines as may be acquired out of the available bond issue funds, and that additional machines to bring the total to 600 machines be rented with the option to purchase, in accordance with the terms of the bid of the Automatic Voting Machine Corporation, and that the County Supervisor be and he is hereby directed to enter into a contract in behalf of St. Louis County to be approved by the County Counselor, for such purchase, rental and option agreement, and that the bid of the Shoup Voting Machine Corporation be not approved."

The issue here presented requires an examination of the pertinent statutes of Missouri. All citations, unless otherwise specified, refer to RSMo 1949, V.A.M.S.

Sections 113.050 to 113.110, as enacted in 1935 and amended in 1937, define the general powers and duties of the Board of Election Commissioners. Section 113.-070 gives it full and complete powers to conduct any and all elections, except school and other similar local elections. Section 113.110 authorizes it to provide, subject to the provisions of § 50.660, "all necessary ballot boxes, registration books, verification lists, poll books, tally sheets, booths, printed ballots, blanks, stationery and all necessary supplies and equipment for the conduct and holding of registrations and elections, * * *."

Section 50.660, upon which respondents place reliance, is a provision of the County Budget Laws. Insofar as here pertinent, it requires that all contracts and purchases made by the governing body of the county (in this instance the County Council) shall be let to the lowest and best bidder after due opportunity for competition, including advertising in a certain manner, and that all bids may be rejected and new bids advertised for.

We now turn to the Voting Machine Law:

Section 121.010 provides that any election authority (relators) may, subject to the provisions of § 121.020, adopt voting machines.

Section 121.020 makes it a prerequisite to the adoption of such machines that the governing body of the county must provide, within the limitations imposed by law, for the payment of the purchase price or rental charge, or both, of such machines as may be proposed by the election authority, except that the qualified voters must first approve any proposed adoption and purchase of such machines by a two-thirds majority and any proposed adoption and rental thereof by a simple majority; and that a vote of the requisite majority upon a proposition to incur indebtedness for purchase or rental shall be deemed to satisfy the requirement for approval by the voters of the adoption and acquisition thereof. Said section also provides that, for the purpose of testing the feasibility of adoption and use of such machines, they may be adopted and acquired for use in not more than ten percent of the precincts without

submitting the question of their adoption and acquisition to the voters.

Section 121.060 provides that any kind or type of machine that fulfills the therein listed thirteen requirements "shall be approved". (Admittedly, both types of machines here involved meet the requirements of this section.)

Section 121.070 provides that:

"1. The election authority in jurisdictions adopting voting machines shall, as soon as practicable thereafter provide for each polling place where voting machines are to be used, one or more machines in complete working order.

"2. If it is impracticable to supply each election district with a voting machine at any election following their adoption, the election authority may supply as many as it is practicable to procure and may specify in which election districts or precincts within its jurisdiction the machines will be used.

"3. When not in use at an election the election authority shall have the custody of the machines."

Respondents contend that the County Council alone has management and control of all funds for the purchase of voting machines, citing Art. VI, §§ 7 and 18(b) of the Constitution of Missouri. The effect of these provisions is to place in the County Council, by virtue of its duly adopted charter, the management of "all county business as prescribed by law." No one disputes that, but it does not solve the question as to what the law prescribes as to authority to purchase voting machines.

Respondents further contend that § 121.060, in stating that "any kind or type of voting machine shall be approved which is so constructed as to fulfill" thirteen therein specified requirements, denies to relators the right to select any particular type of machine as against any other type which is so constructed that it meets said requirements. We do not so construe the section.

Rather, do we believe that it, in effect, fixes only the minimum requirements of any machine the proper authority may purchase, and that to that extent only does it limit the discretion of the proper authority in the selection of such machines.

Respondents further contend that § 121.050, which reads:

"All costs in connection with voting machines, other than for purchase price or rental charge, shall be apportioned and paid in the same manner as other election expenses are apportioned and paid."

actually means, in effect:

"The cost of operating machines shall be apportioned and paid in the same manner as other election expenses are apportioned and paid, *but the purchase price or rental charge shall not* be apportioned and paid as other election expenses." (Emphasis respondents'.)

Respondents then argue that if the purchase prices of and rental charges for voting machines are not to be paid as other election charges then they can only be apportioned and paid as are ordinary purchases of the county for general purposes; and that, therefore, the governing body of the county is charged with the duty of purchasing the machines as it purchases any other supplies.

■ We cannot agree with respondents. We think that § 121.050 was intended to and must be read in connection with § 121.020, the first paragraph of which definitely places the duty of *payment* for the machines here sought to be purchased upon the governing body. It also says: "An affirmative vote of the requisite majority upon any proposition to incur indebtedness to purchase or rent voting machines, shall be deemed to satisfy the requirement for approval by the voters of the adoption and acquisition of voting machines." In other words, the voters of St. Louis County, pursuant to the provisions of § 121.020, authorized relators to adopt voting machines and provided the funds therefor.

Relators thereupon did adopt voting machines. Section 121.020 thereupon places the duty upon respondents to pay for them. It neither directly or impliedly authorizes them to designate the type or number of machines to be provided. Of course, in adopting voting machines, the voters, relators and respondents must keep the amount expended "within limitations imposed by law," as required by § 121.020. There is, however, no contention made that the amount of bonds authorized by the voters exceeds the limits of indebtedness authorized by law. Neither is any contention made that any of the bond funds are expended or have become encumbered by any charge whatsoever.

Respondents further contend that the provisions of § 50.660 of the County Budget Law, which section was by a 1937 amendment engrafted upon § 113.110 of the 1935 Board of Election Commissioners Law, and which provides that "All bids * * * may be rejected and new bids advertised for", vests them with discretion in determining which bid of the two involved herein is the lowest and best bid. The Voting Machine Law was passed long after the County Budget Law and long after § 50.-660 was made a part of § 113.110. The Voting Machine Law deals not with the equipment usually used in conducting elections, but with an intricate and expensive machine devised to expedite voting in congested areas and to insure accuracy in the casting and recordation of the will of the voters as reflected by the ballots cast. It contains no provision requiring that contracts for the purchase of voting machines be awarded in the manner prescribed by the County Budget Law. Relators insist that the County Budget Law cannot be inferentially engrafted upon the Voting Machine Law, thereby limiting the power therein granted them to make the purchase, and that to do so would tend to nullify the intent of the Legislature, citing State ex rel. Armontrout v. Smith, 353 Mo. 486, 182 S.W.2d 571, 574 [5–7].

We think we need not here decide whether respondents could reject a bid for the purchase of a certain type of voting machine requisitioned by the proper authority if in good faith it deemed the bid not to be the best bid obtainable. But there is no suggestion in the record that the bid of Shoup Voting Machine Corporation for 400 "ten (10) column, fifty (50) row combination electrically and manually operated voting machines with front reading counters" was not the best bid obtainable for that type of machine. On the other hand, respondents frankly admit in their brief that the bid of the Automatic Voting Machine Corporation was accepted because they deemed the Automatic machine, although of a different type from the Shoup machine, to be sufficient for the county's needs. Thus, they say:

"In the exercise of its duty to administer the County's business, the County Council and County Officers have determined to their satisfaction that a voting machine with 40 spaces or columns for listing offices and propositions to be voted on is ample for all foreseeable purposes, since the County has never had need for more than 27 spaces. According to the relators' report on voting machines (Exhibit "A"—relators' petition), their approval of the 50-column machine is based on pure speculation, not past experience, as to the required number of columns or spaces, and it would be just as logical and reasonable to speculate that the Charter may be amended to provide for the election of no County officials except members of the Council, so that in the future fewer spaces will be required.

"The County Council has also determined that the manual machine is practical and that proper regard for the business affairs of the County does not justify the expenditure of an additional $100.00 each, for electrically operated machines."

It is our conclusion that § 50.660 of the County Budget Laws does not invest respondents with the discretion of desig-

nating the type or number of voting machines to be used in St. Louis County.

■ Respondents also invoke the provisions of Art. III, § 26, of the Charter and Ordinance No. 46 of the County of St. Louis as authorizing them to designate the type and number of machines to be purchased and used. The charter authorizes the Council to establish procedures governing the making of county purchases. The ordinance, enacted pursuant to the charter provision, creates a Division of Purchasing, and provides "all bids for any * * * purchase may be rejected and new bids advertised for at the discretion of the Supervisor." The provisions of the charter and ordinances of the county which are in conflict with prior or subsequent state statutes relating to governmental matters must yield. State ex rel. Volker v. Carey, 345 Mo. 811, 136 S.W.2d 324, 325 [4]; Kansas City v. J. I. Case Threshing Machine Co., 337 Mo. 913, 87 S.W.2d 195, 202 203 [8, 9]. Statutes pertaining to the conduct of elections are governmental in scope. See last case above cited. But, in any event, neither the charter nor the ordinance directly or impliedly vests respondents with any discretion other than to purchase at the best bid obtainable.

It is clear from the record in this case: (1) that the relators are vested with authority to "adopt voting machines for use in any or all precincts in which registration is required" in St. Louis County, § 121.010, when authorized so to do by the requisite majority of voters, § 121.020; (2) that the voters by a requisite majority did authorize their adoption and provide the funds therefor; (3) that upon being so authorized, it became the duty of relators to "provide for each polling place where voting machines are to be used, one or more machines * * *." § 121.070. All of these statutory requirements have been met.

■ We are convinced and hold that the power and duty to designate the type and number of voting machines to be used in St. Louis County is vested in relators;

that the respondents are charged with the ministerial duty of effecting the purchase of such machines upon requisition duly made by relators; that requisition was duly made; and that respondents unlawfully refused to comply therewith and unlawfully resolved to accept the bid of Automatic Voting Machine Corporation. Mandamus is the remedy. State ex rel. Floyd v. Philpot, Mo.Sup., 266 S.W.2d 704, 711 [6].

The alternative writ is made peremptory.

ELLISON, HYDE, DALTON, and LEEDY, JJ., and ANDERSON, Special Judge, concur.

## On Motion for Rehearing

### PER CURIAM.

On motion for rehearing, relators contend the foregoing opinion holds the County Budget Law not applicable to the purchase of voting machines. It does not so hold. To the contrary, we expressly refrain from passing upon that issue for the reason it is unnecessary to a decision of the issues presented by the pleadings and briefs. What the opinion holds is that respondents' brief irrefutably reveals that the bid on the Shoup machines was rejected not because it was not the lowest and best bid obtainable for that kind and type of machine, but solely because respondents prefer a different type of machine; and that respondents have no right to reject the bid on that ground.

■ Respondents further assert that the advertisement for bids did not set forth specifications sufficient to include the Shoup machine and, for that reason, respondents may be subjected to "liability for awarding a bid otherwise than in accordance with the advertisement". This is clearly an afterthought, no such suggestion has heretofore been made.

The remaining assignments have been considered and found to be without merit. The motion for rehearing is overruled.