Dear Mr. Downing:
In reviewing your opinion request 135-86 pertaining to the following question:
 "May a local government body such as a county commission or a city council enact an ordinance prohibiting compulsory union membership if this county or city has a charter form of government that will allow them to do so?"
We are concerned that the answer to your request would come after you are no longer a state representative. Normally we do not respond to opinion requests after an individual has left office even though that request came while you were appropriately vested as state representative. We, however, recognize that this is an important issue and offer you the following memo because it is not our intention to avoid answering the question.
We take your reference to "an ordinance prohibiting compulsory union membership" as the equivalent of a reference to what is popularly known as a "right to work law."[1] A division of the Missouri supreme court, in Pfitzinger Mortuary, Inc. and Pfitzinger v. Dill et al.,319 S.W.2d 575 (Mo. 1958), remarked:
 . . . Unlike many states Missouri does not have a state labor relations act. . . . Missouri does not have a so-called right-to-work law. . . . The constitution does contain this self-enforcing provision: "That employees shall have the right to organize and to bargain collectively through representatives of their own choosing." Const. Mo. 1945, Art. 1, Sec. 29; . . . . 319 S.W.2d at 577 (Commissioner Barrett (writer); Judges Storckman, Leedy and Eager).
Twenty years later, the full Missouri supreme court inIndependent Stave Company, Inc. v. Higdon et al., 572 S.W.2d 424
(Mo. banc 1978), considered, and rejected "right to work" as an aspect of Article I, (Bill of Rights) § 2, of theMissouri Constitution[2], and while so holding observed:
 . . . [W]e look first to the provisions of the Labor Management Relations Act, 29 U.S.C. § 141-187. That law was enacted by Congress in 1947 pursuant to its power to regulate commerce among the states. . . . Where Congress enacts legislation to govern such commerce, it preempts the field to the exclusion of state constitutional or statutory provisions. . . . In this instance, however, the legislation indicates it is not intended to preempt the field.
 * * * It is clear that by the foregoing sections Congress has provided that a "union security" provision which conforms to the type of agreement described in 29 U.S.C. § 158(a)(3) . . . is permissible and that employees are bound thereby unless the state in which the contract is to be applicable has a law which prohibits such agreements. . . . To that extent Congress has not preempted the field. . . . 572 S.W.2d at 425-426 (Judges Finch (writer), Morgan, Bardgett, Donnelly, Rendlen and Seiler; Special Judge Welborn).
 . . . The language of art. I, § 2 is very general. It says only "that all persons [shall] have . . . the enjoyment of the gains of their own industry. . . ." In this aspect it differs substantially from the constitutional provisions and statutes in other states which undertake to prohibit or limit such things as "union security" provisions. . . . 572 S.W.2d at 428 (Id.)
 Statutes and constitutional provisions of the other states which have undertaken to prohibit or restrict "union security" provisions have been equally specific. . . .
 * * * We hold that art. I, § 2 of the Missouri constitution does not prohibit the inclusion of a "union security" provision in a collective bargaining agreement. That being true, the "union security" provision in the contract between . . . [Independent Stave Company and Local 42, Coopers International Union] . . . is not prohibited by Missouri law and is valid and enforceable under the provisions of . . . [the Labor Management Relations Act] . . . . 572 S.W.2d at 429 (Id.)
One month after the decision in Independent StaveCompany, the voters of Missouri defeated a proposed addition to the Missouri constitution's Bill of Rights (Article I) that would have prohibited "compulsory unionism" or protected the "right to work."[3]
House Report No. 510, June 3, 1947, Committee of Conference, accompanying the Labor-Management Relations Act of 1947, included these remarks:
 Under the House bill there was included a new section 13 of the National Labor Relations Act to assure that nothing in the act was to be construed as authorizing any closed shop, union shop, maintenance of membership or other form of compulsory unionism agreement in any State where the execution of such agreement would be contrary to State law. Many States have enacted laws or adopted constitutional provisions to make all forms of compulsory unionism in those States illegal. It was never the intention of the National Labor Relations Act . . . to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism. Neither the so-called "closed shop" proviso in section 8(3) of the existing act nor the union shop and maintenance of membership proviso in section 8(a)(3) of the conference agreement could be said to authorize arrangement of this sort in States where such arrangements were contrary to the State policy. . . . United States Code Congressional Service (1947), p. 1166
Just after enactment of this federal legislation, the United States supreme court, in Lincoln Federal Labor UnionNo. 19129, AFL et al. v. Northwestern Iron and Metal Co. etal., 335 U.S. 525 (1948) upheld North Carolina statutory and Nebraska constitutional provisions forbidding "compulsory unionism" against challenges based upon the federal constitution (impairment of contract; equal protection and due process of law). The court commented:
 . . . Precisely what these state laws do is to forbid employers acting alone or in concert with labor organizations deliberately to restrict employment to none but union members. 335 U.S. at 530.
 . . . There cannot be wrung from a constitutional right of workers to assemble to discuss improvement of their own working standards, a further constitutional right to drive from remunerative employment all other persons who will not or cannot, participate in union assemblies. . . . 335 U.S. at 531
 . . . And although several States in addition to those at bar now have such laws, the legislature of as many other States have sometimes repeatedly rejected them. What one State can refuse to do, another can undo. 335 U.S. at 554
When the United States supreme court subsequently considered and upheld state "right to work" laws vis-a-vis the 1947 federal legislation,Retail Clerks InternationalAssociation, Local 1625, AFL-CIO et al. v. Schermehorn etal., 375 U.S. 96 (1963), the court observed:
 While § 8(a)(3) of the Taft-Hartley Act provides that it is not an unfair labor practice for an employer and a union to require membership as a condition of employment provided the specific conditions are met, § 14(b) . . . provides:
* * *
 Section 14(b) came into the law in 1947, some years after the Wagner Act. The latter did not bar as a matter of federal law an agency-shop agreement. . . . 375 U.S. at 98-99
 By the time § 14(b) was written into the Act, twelve States had statutes or constitutional provisions outlawing or restricting the closed shop and related devices — a state power which we sustained. . . . These laws — about which Congress seems to have been well informed during the 1947 debates — had a wide variety of sanctions. . . . In 1947 Congress did not outlaw union-security agreement per se;
but it did add new conditions, which . . . require that there be a 30-day waiting period before any employee is forced into a union, that the union in question is the appropriate representative of the employees, and that an employer not discriminate against an employee if he has reasonable grounds for believing that membership in the union was not available to the employee on a nondiscriminatory basis or that the employee's membership was denied or terminated for reasons other than failure to meet union shop requirements as to dues or fees. In other words, Congress undertook pervasive regulation of union-security agreements, raising in the minds of many whether it thereby preempted the field . . . and put such agreements beyond state control. . . . 375 U.S. at 99-101
 In light of the wording of § 14(b) and this legislative history, we conclude that Congress in 1947 did not deprive the States of any and all power to enforce their laws restricting the execution and enforcement of union-security agreements. . . .
 . . . Yet even if the union-security agreement clears all federal hurdles, the States by reason of § 14(b) have the final say and may outlaw it. . . . There is thus conflict between state and federal law; but it is a conflict sanctioned by Congress with directions to give the right of way to state laws barring the execution and enforcement of union-security agreements. . . . 375 U.S. at 102-103
 Congress, in other words, chose to abandon any search for uniformity in dealing with the problems of state laws barring the execution and enforcement of agreements authorized by § 14(b) and decided to suffer a medley of attitudes and philosophies on the subject. 375 U.S. at 104-105
The highest court of Kentucky, in Kentucky State AFL-CIOet al. v. Puckett, Mayor of Shelbyville et al., 391 S.W.2d 360
(Ky. 1965), struck down a municipal "right to work" ordinance with these observations:
 The significant portion of the ordinance is:
 ". . . The right of persons to work shall not be denied or abridged on account of membership or nonmembership in, or conditioned upon payments to, any labor union, or labor organization; . . ." 391 S.W.2d at 361
 . . . The initial question with which we are faced is whether Congress has preempted the field of regulation of such union-security grants to the extent that local political subdivisions of a state have no power to legislate in the field (as affects interstate commerce).
 Section 14(b) of the National Labor Management Relations Act, as amended, 29 U.S.C.A. § 164(b), provides:
 "(b) Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State
or Territory in which such execution or application is prohibited by State
or Territorial law." (our emphasis) 391 S.W.2d at 361-362
 . . . We think it is not reasonable to believe that Congress could have intended to waive other than to major policy-making units such as states and territories, the determination of policy in such a controversial area as that of union-security agreements. We believe Congress was willing to permit varying policies at the state level, but could not have intended to allow as many local policies as there are local political subdivisions in the nation. 391 S.W.2d at 362
We recognize that the Kentucky decision did not involve a consideration of the power of constitutionally chartered local governments within a state exercising what is colloquially referred to as "home rule" to enact or adopt "right to work" measures consistent with the federal legislation.
The Missouri constitution, Art. VI (Local Government), provides for constitutional charter government for some counties (§ 18) and many cities (§ 19). About chartered counties, the Missouri supreme court has made these observations:
 State ex rel. Cole et al., the St. Louis County Board of Election Commissioners v. Matthews, County Supervisor et al., 274 S.W.2d 286 (Mo. banc 1955)
 . . . The provisions of the charter and ordinances of the county which are in conflict with prior or subsequent state statutes relating to governmental matters must yield. . . . 274 S.W.2d at 292 (Judges Hollingsworth (writer), Ellison, Hyde, Dalton and Leedy; Special Judge Anderson)
 State on inf. Dalton, Attorney General ex rel. Shepley v. Gamble et al., the St. Louis County Police Commissioners and DuBois, County Police Superintendent, 280 S.W.2d 656 (Mo. banc 1955)
 Moreover, charter counties are empowered with some of the powers and functions of a municipal corporation in the area outside incorporated cities. . . . These are policy powers ordinarily vested in municipal corporations. . . . A county under the special charter provisions of our constitution . . . must perform state functions over the entire county and may perform functions of a local or municipal nature at least in the unincorporated part of the county. These are constitutional grants which are not subject to, but take precedence over, the legislative power. . . . 280 S.W.2d at 660 (Judges Storckman (writer), Leedy, Dalton, Hollingsworth, Westhues, Hyde and Eager)
 Hellman v. St. Louis County, 302 S.W.2d 911
(Mo. 1957)
 Article VI, § 18(b) of the Constitution . . . carries with it an implied grant of such powers as are reasonably necessary to the exercise of the powers granted and are not contrary to the public policy of the state. . . . 302 S.W.2d at 916 (Judges Hollingsworth (writer), Hyde, Dalton and Westhues)
 State ex rel. St. Louis County v. Sommers and Kirkpatrick, Secretary of State et al., 426 S.W.2d 72 (Mo. 1968)
 . . . Part of the judicial power of the state is vested by the constitution in the circuit, probate, and magistrate courts. . . . The matter of the selection of circuit, probate, and magistrate judges is not a power which is incident to home rule county government. We hold such is not within the power directly granted St. Louis County in its home rule charter or reasonably necessary to the exercise of the powers which are granted to it. . . . Even though St. Louis County under its charter must perform certain state functions over the entire county . . . it is not within the constitutional power granted the county to provide for the manner of selection of such judges. . . . 426 S.W.2d at 74 (Judges Seiler (writer), Storckman and Holman) Flower Valley Shopping Center, Inc. v. St. Louis County et al., 528 S.W.2d 749 (Mo. banc 1975)
 . . . In our opinion, the question whether owners of private property may be compelled to provide police protection for shoppers is also one of state-wide concern and may not be addressed by counties without constitutional or statutory authority more explicit than is found in Art. VI, § 18(b). 528 S.W.2d at 754 (Judges Donnelly (writer), Morgan, Holman, Bardgett, Henley and Finch)
 I concur in the principal opinion, but would emphasize that under the provisions of Art. VI, Section 18, Mo. Const., county charters are instruments which grant power and I take what is said in the principal opinion to be said with that in mind. We are not dealing here with a charter which is an instrument to limit power, as is now true of charters for charter cities under the constitutional amendments adopted in 1971 to Art. VI, Secs. 19 and 19(a) as I understand them. A charter city has the power, provided it is consistent with the Constitution and not denied by charter of statute. 528 S.W.2d at 754 (Judge Seiler)
About constitutionally chartered cities, the Missouri Supreme Court has observed:
 St. Louis Children's Hospital v. Conway, Mayor of St. Louis et al., 582 S.W.2d 687
(Mo. banc 1979)
 . . . [A]rt. 6, sec. 19(a), Mo. Const., clearly grants to a constitutional charter city all power which the legislature could
grant. . . . 582 S.W.2d at 690 (Per curiam: Judges Morgan, Bardgett and Seiler; Special Judge Welborn, Senior Judge Finch)
 State ex inf. Hannah, Prosecuting Attorney ex rel. Christ et al. v. City of St. Charles, 676 S.W.2d 508 (Mo. banc 1984)
 We have always adhered to the view that the charter of a home rule municipality, subject to certain limitations, is the organic law of the municipality. . . . However, prior to the adoption of § 19(a) [in 1971], the powers which a home rule municipality could exercise through the constitutional grant of a right to adopt a charter, were limited to the powers which the people of the city expressly delegated to the city under the charter and those powers given by the statute. . . . Section 19(a) clearly grants to a constitutional charter city all power which the legislature is authorized to grant. . . . 676 S.W.2d at 512 (Judges Donnelly (writer), Rendlen, Billings, Gunn, Higgins, Blackmar and Welliver)
 . . . [T]he power conferred upon a constitutional charter city by virtue of § 19(a) is subject to whatever limitations are imposed upon that power by the Constitution, by its charter or by statute. . . .
 Under § 19)a), a constitutional charter city is prohibited from exercising its home rule power in a manner that is inconsistent with a state statute. . . . 676 S.W.2d at 513 (Id.)
 Cape Motor Lodge, Inc. et al. v. City of Cape Girardeau et al., 706 S.W.2d 208 (Mo. banc 1986)
 Under section 19(a), the emphasis no longer is whether a home rule city has the authority to exercise the power involved; the emphasis is whether the exercise of that power conflicts with the Missouri constitution; state statute, or the charter itself. . . . Once a determination of conflict between a constitutional or statutory provision and a charter or ordinance provision is made, the state law provision controls. . . . 706 S.W.2d at 211
(Judges Higgins (writer), Billings, Blackmar, Donnelly, Welliver, Robertson, and Rendlen)
 The test for determining if a conflict exists is whether the ordinance "permits what the statute prohibits" or "prohibits what the statute permits." . . . 706 S.W.2d at 211 (Id.)
Regardless of the "home rule" powers of a constitutionally chartered county or city to adopt an "anti-compulsory unionism" or "right to work" ordinance insofar as employment relationships with interstate commerce are concerned, we believe that the Congress of the United States has foreclosed all but statewide "right to work" legislation as a means to defeat the federal preemption of the regulation of union security agreements. Clearly there are few industries that come into the state that do not impact on interstate commerce. We do not think the attempted exercise of otherwise proper "home rule" power by a Missouri county or city can defeat the federal regulation of union security agreements within interstate commerce.
Finally, as I have indicated at the outset, we do not feel that we can properly offer to you an official opinion on this subject. Because of the importance of the issue we do feel it appropriate to submit the above memo to you for your information and consideration.
Sincerely,
 WILLIAM L. WEBSTER Attorney General
[1] The Idaho supreme court, In re Petition of Idaho StateFederation of Labor (AFL), etc. concluded that the phrase "right to work" was an insufficient ballot title to inform voters of the true nature of the proposed legislation:
 This short title must, therefore, so far as possible within ten words, set forth the characteristics which distinguish this proposed measure and expeditiously and accurately acquainted to prospective signers with what he is sponsoring. . . . 272 P.2d at 710
 The chief characteristic and paramount, distinctive features of the proposed statute are, that a person shall be allowed to seek, gain, obtain and retain employment regardless of whether or not he is a member of a labor union or labor organization. . . . Thus, tersely stated, this is an initiative measure for the right to work regardless of union membership or non-membership.
 This phase of the proposed statute is not in any way presented or mentioned in the short title prepared ["The Right to Work Initiative Proposal."] and hence, it is defective and does not comply with the appropriate statutory requirements. . . .
 . . . [N]o doubt in many instances the title as prepared by the Attorney General is commonly used. . . . The deficiency in the title, therefore, in no way reflects any discredit on the learned Attorney General. 272 P.2d at 711.
[2] In order to assert our rights, acknowledge our duties, and proclaim the principles on which our government is founded, we [the people of Missouri] declare:
* * * . . . that all persons have a natural right to life, liberty, the pursuit of happiness and the enjoyment of the gains of their own industry; . . . Art. I, § 2, Mo. Const.
[3] The proposed new Section 29(a) read:
 That no person shall be deprived of the right and freedom to work at his chosen occupation for any employer because of payment or nonpayment of dues, fees, assessments, or other charges of any kind to any labor organization; and that any contract which contravenes this right is illegal and void.
This proposition (denominated Constitutional Amendment No. 23) received the approval of 631,829 (40%) and the disapproval of 948,837 (60%) voters at the November 7, 1978 general election.
A proposed "right to work" or "anti-compulsory unionism" constitutional (H.J.R. No. 2) or statutory (H.B. No. 24) provision was introduced in the 1972 session of the Missouri legislature, but to the best of our knowledge, no similar effort in the state legislature has transpired since the 1978 public referendum on the issue.